**REVISED, May 8, 1998**

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 97-50082

_____

RENE GUTIERREZ, Individually and on behalf of the estate of Rene Gutierrez, Jr; LIBRAVA GUTIERREZ, Individually and on behalf of the Estate of Rene Gutierrez, Jr; ROSANNA GUTIERREZ, as next friend of Monica Gutierrez and Monique Gutierrez,

                    Plaintiffs-Appellees,

versus

CITY OF SAN ANTONIO; ET AL,

                    Defendants,

LAWRENCE WALTERS, San Antonio Police Officer individually and in his official capacity; ROBERT SOLIS, San Antonio Police Officer individually and in his official capacity

                    Defendants-Appellants.

_____

Appeal from the United States District Court
For the Western District of Texas
_____

April 14, 1998

Before EMILIO M. GARZA, STEWART, and DENNIS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

The family of Rene Gutierrez, Jr. ("Gutierrez") brought suit against the defendant police officers, Lawrence Walters, Jr. and Robert Solis (the "officers"), for allegedly depriving him of his

rights under the Fourth and Fourteenth Amendments of the U.S. Constitution by hog-tying him. The district court issued an order granting in part and denying in part the officers' summary judgment and FED. R. CIV. P.12 (b)(6) motions. The officers now bring an interlocutory appeal seeking dismissal or summary judgment based on qualified immunity. Because we conclude that material disputes of fact prevent us from determining the objective reasonableness of the officers' conduct, we dismiss their appeal of the Fourth Amendment claim for lack of jurisdiction and vacate and render a take nothing verdict on the Fourteenth Amendment claim.

I

Shortly before midnight on November 27, 1994, Walters and Solis drove toward a heavily trafficked intersection in San Antonio, Texas, in a part of town known for high drug use. Passing through the intersection, they saw Gutierrez stand up from the side of the street and begin stumbling around in the intersection, wearing a pair of trousers but no shoes, shirt, or other clothing.

Walters initially thought that Gutierrez was intoxicated. He turned the patrol car around approximately one block west of Gutierrez and began to drive back towards Gutierrez. The officers observed him running around in circles in the middle of the street and slipping and falling on his side. As they parked the patrol car and approached Gutierrez, he began swinging his arms wildly and crawling toward them on his hands and knees. Gutierrez shouted out that he had been shot; the officers checked, but found no bullet wounds on Gutierrez or nearby persons with guns. The officers did

-2-

notice numerous abrasions on his chest and bleeding from his mouth.

Walters cuffed Gutierrez "for his safety and mine." He did not arrest Gutierrez, but police reports indicate that Walters intended to do so later. Walters also noted that Gutierrez's eyes were glassy, he was walking unsteadily, and his speech was slurred. When Walters asked Gutierrez if he had taken any drugs, Gutierrez said that he had "shot some bad coke." Solis later testified that Gutierrez was "exhibiting that he was high on some type of drugs."

Solis called an ambulance ("EMS"), allegedly for a possible toxic ingestion overdose. While waiting for the EMS to arrive, Gutierrez sat calmly with his back against a rear door of the patrol car. As traffic in the intersection increased, Walters placed Gutierrez face down in a prone position in the back seat and drove the patrol car into a neighboring parking lot. Gutierrez was quiet and peaceful, and his feet were not restrained in any way.

When the EMS arrived, Walters told EMS Technicians Ernest Lavin and Michelle Cevallos that Gutierrez had admitted to injecting bad cocaine. Lavin and Walters removed Gutierrez from the back seat of the patrol car and walked him toward the EMS vehicle. When Gutierrez got to the rear of the EMS unit, he turned around and sat down. Gutierrez suddenly began to push and tried to get into the EMS vehicle, yelling "put me in." As abruptly, he kicked Lavin in the chest, and shouted "get me out." Due to this violence, Lavin refused to transport Gutierrez to the hospital. Walters then asked Lavin whether Gutierrez could be safely transported in a patrol car, to which Lavin replied that Gutierrez

appeared to be having psychiatric problems rather than a reaction to bad drugs.

Walters and Lavin returned Gutierrez to the back seat of the patrol car to transport him to a local hospital for examination, allegedly placing him face down in the back seat. Gutierrez began to kick the back of the driver's seat, the metal cage, and the windows of the patrol car with his bare feet. Walters and Solis agreed that Gutierrez's legs would have to be restrained, "for his safety and ours." Solis got his personal leg-restraint device from the patrol car, a nylon rope with a loop on one end and a clasp on the other (a "hog-tie"). Walters placed the loop around Gutierrez's feet, and Solis linked the clasp around the handcuffs, drawing Gutierrez's legs backward at a 90-degree angle in an "L" shape, thereby "hog-tying" him. Whether the officers then placed Gutierrez in a face down position on the rear seat or with his face pointed toward the rear of the front seat is disputed, but as the officers set off for the hospital, he was conscious and struggling.

Walters and Solis drove to the hospital at a normal rate of speed with their lights and sirens off and the rear of the patrol car darkened. While Walters drove, Solis occasionally checked to see if Gutierrez's restraints were secure, but he did not check to see if Gutierrez was still breathing or otherwise monitor him. Approximately ten minutes into the journey, all sounds of Gutierrez struggling stopped. Upon arriving at the hospital, Walters went into the hospital to summon medical personnel while Solis, believing Gutierrez to be asleep, began to nudge him. At that

-4-

time, Gutierrez was face down on the seat, a position that allegedly restricted the amount of oxygen that could reach his heart and his heart's ability to pump oxygen-enriched blood throughout his body. Medical personnel came out to the car, the restraints were removed, and the medical personnel discovered that Gutierrez did not have a pulse. They then took him into the emergency room where doctors pronounced him dead.

At the autopsy, Dr. Vincent DiMaio, Chief Medical Examiner of Bexar County, initially determined that Gutierrez had died as a result of the combined effects of methadone, cocaine, imipramine and morphine. Dr. DiMaio later issued an addendum to the Autopsy Report that stated:

> Subsequent to completion of the autopsy report on Rene Gutierrez, this office discovered that when the deceased was transported in the San Antonio Police Department unit, that he was placed on the back seat, face down, his hands secured behind his back with handcuffs and his feet tied with a rope which was then tied to his hands or the handcuffs. In other words, the deceased was "hog tied."
> It is known that "hog tying" of an individual and placing them in the position that Rene Gutierrez was placed, can produce a relative hypoxia and in some instances death. Based on the new information supplied, it is our opinion that the "hog tying" was a contributory cause to Rene Gutierrez's death.

Gutierrez's family filed a claim alleging violations of 42 U.S.C. §§ 1981, 1983, 1985 and 1986 based the Fourth, Eighth, and Fourteenth Amendments of the U.S. Constitution and pendant state tort law claims. Solis filed a motion to dismiss or, in the alternative, for summary judgment, based on a qualified immunity defense. Walters also filed a summary judgment motion arguing the same defense.

-5-

In response to these motions, Gutierrez introduced three pieces of evidence into the summary judgment record suggesting hog-tying to be unreasonable under these circumstances: (1) a 1991 San Diego Task Force Study in the possession of the San Antonio Police Department ("SAPD") in November 1994 indicating that the combination of hog-tying a drug-affected person in "cocaine psychosis" (excited delirium) and "positional asphyxia" (placing them in a face-down prone position) can lead to death ("Sudden Custody Death Syndrome" or "SCDS"); (2) an article entitled "Sudden Custody Death Syndrome: The Role of Hogtying," that appeared in the fall 1994 issue of *Criminal Law Update*; and (3) a memo issued by SAPD Captain Benavides ten days after the death of Gutierrez "reminding" officers that hog-tying anyone was prohibited.

The district court dismissed Gutierrez's Eighth Amendment claim but denied summary judgment on the Fourth and Fourteenth Amendment claims. Walters and Solis timely appealed from the denial of their motions.

II

We review the denial of a summary judgment motion *de novo*, viewing the evidence in the light most favorable to the nonmovant.[1] *See Nerren v. Livingston Police Dep't*, 86 F.3d 469, 470 & n.1 (5th

---

[1] Solis filed a motion urging that the district court either dismiss Gutierrez's complaint under FED. R. CIV. P. 12(b)(6) or grant him summary judgment under FED. R. CIV. P. 56. Solis attached materials outside the pleadings to this motion, thereby converting it into a Rule 12(c) motion. We review the denial of a Rule 12(c) motion under the same standard of review as a summary judgment motion. *See Baker v. Putnal*, 75 F.3d 190, 197 (5th Cir. 1996).

Cir. 1996). Summary judgment is appropriate where "there is no genuine issue of material fact and [] the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). To win summary judgment, the movant must show that the evidence in the record would not permit the nonmovant to carry its burden of proof at trial. *See Celotex v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the movant meets this burden, the burden of coming forward with evidence in the summary judgment record creating an issue of material fact shifts to the nonmovant. *See Hale v. Townley*, 45 F.3d 914, 917 (5th Cir. 1995). The nonmovant must set forth specific facts showing a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248, 106 S. Ct. at 2510. "Material facts" are those "that might affect the outcome of the suit under the governing law." *Id*.

### III

Although Gutierrez concedes that we have jurisdiction to hear this interlocutory appeal, we have an independent duty to examine the basis for our jurisdiction. *See Behrens v. Pelletier*, 516 U.S. )), 116 S. Ct. 834, 842, 133 L.Ed.2d 773 (1996) (holding that where there are issues of law separable from the merits of a claim, a court of appeals has jurisdiction to review those issues of law on interlocutory appeal, even when the district court denied summary judgment on the basis that material disputes of fact remain);

-7-

*Johnson v. Jones*, 515 U.S. 304, 313, 115 S. Ct. 2151, 2156, 132 L.Ed.2d 238 (1995) (holding that when the only issue presented on interlocutory appeal is whether the evidence could support a finding that an official's conduct violated clearly established law, a court of appeals lacks jurisdiction to review the denial of summary judgment). In the instant case, the district court's order did not state why it denied the officers' Rule 12(b)(6) and summary judgment motions. After "undertak[ing] a cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed," *Johnson*, 515 U.S. at 319, 115 S. Ct. at 2159, we find there to be several disputes of material fact. However, as even Gutierrez concedes, we have jurisdiction to consider the officers' contention that issues of law separable from the merits exist))namely, whether hog-tying violates clearly established law and whether their conduct was objectively reasonable. *See Behrens*, 516 U.S. at )), 116 S. Ct. at 842; *Cantu v. Rocha*, 77 F.3d 795, 802 (5th Cir. 1996).

IV

Qualified immunity protects officials in the course of performance of their discretionary duties unless their conduct violates a "clearly established [federal] statutory or constitutional right[] of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L.Ed.2d 396 (1992). We first determine whether a plaintiff has alleged the violation of a clearly established constitutional right. *See Siegert v. Gilley*, 500 U.S. 226, 231,

-8-

111 S. Ct. 1789, 1792-93, 114 L.Ed.2d 277 (1991).  If we find a right to be clearly established, we examine the objective legal reasonableness of the official's conduct under the circumstances, "in light of clearly established law and the information the [ ] officers possessed." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).  Qualified immunity thus protects an official whose conduct was objectively reasonable, even if the conduct infringed upon a constitutional right of the plaintiff.  *See id.* at 641, 107 S. Ct. at 3040.

## A

### 1

Walters and Solis initially argue that the right to be free of hog-tying was not clearly established in November 1994 because neither the Supreme Court nor the Fifth Circuit (or any other circuit) had specifically held that hog-tying constituted excessive force.  Such a dogmatic argument is unjustified.  In *Anderson*, the Supreme Court stated that whether a clearly established right has been violated "substantially depends upon the level of generality at which the relevant 'legal rule' is to be identified."  483 U.S. at 639, 107 S. Ct. at 3038-39.  The Court thus required that "the contours of the right" be defined narrowly enough so that a given official, with the information that he possesses at the time he takes the action, could understand that what he is doing violates the right.  *Id*. at 640, 107 S. Ct. at 3039.  However, the Court did not require that the specific action in question have been held unlawful to overcome the official's qualified immunity. *Id*.  It

-9-

held only that the unlawfulness of the specific action be apparent "in the light of pre-existing law." *Id.*

Gutierrez's family alleges that the officers used excessive force against Gutierrez by hog-tying him, in violation of the Fourth Amendment. The protections of the Fourth Amendment are triggered when a police officer seizes an individual. *See Tennessee v. Garner*, 471 U.S. 1, 7, 105 S. Ct. 1694, 1699, 85 L.Ed.2d 1 (1985) ("Whenever an officer restrains the freedom of a person to walk away, he has seized that person."); *see also California v. Hodari D.*, 499 U.S. 621, 624-25, 111 S. Ct. 1547, 1550, 113 L.Ed.2d 690 (1991); *Brower v. County of Inyo*, 489 U.S. 593, 596-97, 109 S. Ct. 1378, 1381, 103 L.Ed.2d 628 (1989). Whether a seizure is reasonable under the Fourth Amendment depends not only upon whether the seizure itself is reasonable, but also upon how the police seize the individual or item. *See Garner,* 471 U.S. at 7-8, 105 S. Ct. at 1699; *Harper v. Harris County, Tex.*, 21 F.3d 597, 600 (5th Cir. 1994). "All claims that law enforcement officers have used excessive force))deadly or not))in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). The Fourth Amendment's prohibition of the use of excessive force by the police against seized persons had thus been clearly established prior to November 1994.

Because *Anderson* requires that "the contours of the right [] be sufficiently clear that a reasonable official would understand

-10-

that what he is doing violates the right," 483 U.S. at 640, 107 S. Ct. at 3039, we will examine whether a reasonable police officer in November 1994 would have known whether hog-tying falls within the bounds of the Fourth Amendment's prohibition of the use of excessive force "in the light of pre-existing law." *Id*. at 640, 107 S. Ct. at 3039. As a subset of excessive force claims, in *Garner,* the Supreme Court held that police use of "deadly force" violates the Fourth Amendment unless "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others[.]" 471 U.S. at 11, 105 S. Ct. at 1701. Although guns represent the paradigmatic example of "deadly force," *Garner* failed to address whether other police tools and instruments can also be characterized as "deadly force." Lower courts since have struggled with whether to characterize various police tools and instruments as "deadly force." *See, e.g., Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593-94 (7th Cir. 1997) (restraint in a prone position); *Quintanilla v. City of Downey*, 84 F.3d 353, 357 (9th Cir. 1997) (police dog); *In re City of Philadelphia Litigation*, 49 F.3d 945, 966 (3rd Cir. 1995) (bomb); *Donovan v. City of Milwaukee*, 17 F.3d 944, 949-950 (7th Cir. 1994) (deadman roadblock); *Robinette v. Barnes*, 854 F.2d 909, 911-12 (6th Cir. 1988) (police dog). These courts have generally described "deadly force" as force "carry[ing] with it a substantial risk of causing death or serious bodily harm." *Robinette*, 854 F.2d at 912. Although we have not had occasion to adopt this description, both the Texas statute and SAPD

procedures in effect in November 1994 employed it. *See* TEX. PENAL STAT. ANN. § 1.07(17); SAPD Procedure 501.03(C) ("'Deadly Force' means force that is intended or known by the actor to cause, or in the manner of its use or intended use, is capable of causing death or serious bodily injury."). The Texas statute and SAPD procedures in effect in November 1994 also conformed to *Garner*'s holding that an officer can use "deadly force" only against a suspect who poses a threat of death or serious physical harm to the officer or to others. *See* TEX. CODE CRIM. P. ANN. art. 6.06; SAPD Procedure 501.05 ("An officer uses deadly force only in situations which indicate that he or another person may be seriously injured or killed if such deadly force is not used."). Accordingly, we find both the definition of "deadly force" and *Garner*'s holding to have been clearly established prior to November 1994.

2

The question thus becomes whether hog-tying in these circumstances creates a substantial risk of death or serious bodily injury, and hence, becomes deadly force. Gutierrez relies on the San Diego Study suggesting that a number of persons in police custody have died due to SCDS. *See* San Diego Police Department, *Final Report of the Custody Death Task Force* (unpublished, June 1992) ("San Diego Study"). This Study finds SCDS to be caused by the combination of (1) drug use, (2) positional asphyxia, (3) cocaine psychosis, and (4) hog-tying or carotid choke holds. *Id*. at 6-12. Gutierrez thus presents sufficient evidence that hog-tying may create a substantial risk of death or serious bodily injury in

these circumstances and thereby become deadly force. *See Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994) (suggesting that whether a given tool or instrument in certain circumstances is "deadly force" is a question of fact). Assuming this evidence to be true, hog-tying in these circumstances would have violated law clearly established prior to November 1994.

B

To determine the objective reasonableness of Walters and Solis' conduct, we examine whether "a reasonable officer could have believed [their conduct] to be lawful, in light of clearly established law and the information the [] officers possessed." *Anderson*, 483 U.S. at 641, 107 S. Ct. at 3040. We balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396, 109 S. Ct. at 1871 (quoting *Garner*, 471 U.S. at 8, 105 S. Ct. at 1699). We pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396, 109 S. Ct. at 1872. We do not utilize "the 20/20 vision of hindsight," *id.*, and we consider "the fact that police officers are often forced to make split second judgments))in circumstances that are tense, uncertain, and rapidly evolving))about the amount of force that is necessary in a particular situation." *Id*. at 396-97, 109

-13-

S. Ct. at 1872. Thus, "[e]ven law enforcement officials who 'reasonably but mistakenly' [use excessive force] are entitled to immunity." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 536, 116 L.Ed.2d 589 (1991) (quoting *Anderson*, 483 U.S. at 641, 107 S. Ct. at 3040).

In arguing that their conduct was objectively reasonable, Walters and Solis first present the affidavit of Commander Albert Rodriguez, who states that the official policies of the SAPD, the Texas Department of Public Safety, and the International Association of Chiefs of Police Use of Force Model Policy in November 1994 did not prohibit the use of hog-ties. He further avers that SCDS was not known to reasonably well-trained police officers in Texas at that time, and that hog-tying was reasonable under these circumstances. To counterbalance this affidavit, Gutierrez presents that of Lou Reiter, former Deputy Chief of the Los Angeles Police Department, who analyzes the facts of this case and states that Solis and Walters' use of force and actions were unreasonable. Claiming that a "battle of the experts" thus exists, Solis and Walters assert that they are entitled to qualified immunity because "if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). We do not believe that the Supreme Court intended by this statement to mean that summary judgment must be granted in favor of the police whenever they can find an expert to testify that their actions were reasonable; in such a scenario, the police would

-14-

virtually always win summary judgment. Moreover, an expert's opinion does not establish reasonableness as a matter of law, especially when directly contradicted by another expert's well-supported opinion.[2] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986) (holding that credibility determinations are to be determined by the trier of fact, not by the court on a summary judgment motion); 7 Wigmore on Evidence § 1920, at 18 (Chadborn rev., 1978) (holding that an expert cannot usurp the jury's function as a trier of fact because the jury can choose to reject the expert's opinion). We can still conclude, of course, that one expert accurately expresses what a reasonable police officer would do, but we are not forced to so conclude by the mere presence of an expert's opinion.

The officers also point to certain facts that may favor them. They argue that Gutierrez may have posed a threat to himself, themselves, and the public as he stumbled around in the intersection, although they do not argue that he posed a threat of death or serious physical injury to themselves or to others. *See Garner*, 471 U.S. at 3, 105 S. Ct. at 1697. They further note that immediately prior to being hog-tied, Gutierrez attempted to kick the back of the driver's seat, the metal cage, and the windows of the patrol car with his bare feet, and that they believed Gutierrez's legs had to be restrained, "for his safety and ours,"

---

[2] An analogous issue often arises in cases concerning possible contract ambiguity. A contract is not ambiguous just because one party so claims or because the parties disagree on the correct interpretation of its terms. *See D.E.W., Inc., v. Local 93, Laborers' Int'l Union*, 957 F.2d 196 (5th Cir. 1992).

although they concede that at many other points during their encounter Gutierrez was quiet and nonviolent. They also note that the EMS technicians refused to transport Gutierrez because of his violence, suggesting that they had no alternative but to hog-tie him in order to transport him.[3] Finally, they also argue, and Gutierrez's family does not dispute, that they were trying to help Gutierrez by taking him to the hospital when they hog-tied him, not to hurt him.

To counter this summary judgment record evidence, Gutierrez points to many material disputes of fact. A material dispute of fact exists as to whether a reasonable officer would have known of the first alleged causal factor of SCDS, Gutierrez's drug use. Some evidence suggests that Walters and Solis knew that Gutierrez was under the influence of drugs. Gutierrez told Walters that he had used bad cocaine. His eyes were glassy, his speech was slurred, and he walked unsteadily, all classic symptoms of drug use on which the officers received police academy training. Solis also noted that Gutierrez was "exhibiting that he was high on some type of drugs." Later, after refusing to transport Gutierrez, EMS Technician Lavin characterized Gutierrez as having psychiatric problems rather than a reaction to bad drugs, suggesting that as the encounter progressed, the officers' perception of Gutierrez as

---

[3] The summary judgment record depositions of both Walters and Solis indicate that a wagon may have been available to transport Gutierrez, but that they chose not to call a wagon because they were afraid that Gutierrez might injure himself on the metal interior of the wagon. We express no opinion as to the wisdom of the officers' decision to transport Gutierrez in a patrol car rather than in the wagon.

being under the influence of drugs changed to one in which they concluded they were dealing with a person experiencing psychiatric problems.  Other evidence could lead the jury to either conclusion.

Another material dispute of fact exists with regard to the second alleged causal factor of SCDS, positional asphyxia.  The officers claim they placed Gutierrez on his side with his head facing the front of the rear seat, while Gutierrez's family alleges that they placed him face down on the rear seat.  It is clear that upon arrival at the hospital, at least, Gutierrez was in a face down position.  This dispute is critical because the San Diego Study suggests that SCDS and positional hypoxia allegedly result when a person is placed in a prone face-down position so that all of their weight is concentrated on their chest, thereby interfering with the mechanical process of inhalation and exhalation.  *See* Donald T. Reay et al., *Positional Asphyxia During Law Enforcement Transport*, 13 Am. J. Forensic Med. Pathology 90 (1992); Donald T. Reay et al., *Effects of Positional Restraint on Oxygen Saturation and Heart Rate Following Exercise*, 9 Am. J. Forensic Med. Pathology 16 (1988).  If the officers placed Gutierrez on his side, however, no breathing impairment would have been created.[4]

In *Anderson*, the Supreme Court also noted that the information an officer possesses when that officer takes an action impacts upon

---

[4]    Even if the jury concludes that the officers placed Gutierrez on his side, it may still conclude that the officers' failure to monitor him, *see* post at 2856, amounted to deliberate indifference, thereby permitting Gutierrez to roll into a face down position during the time that the officers transported him to the hospital.

-17-

the objective legal reasonableness of the officer's conduct. 483 U.S. at 641, 107 S. Ct. at 3040. A material dispute of fact exists with regard to whether the SAPD warned its officers of the possible dangers of hog-tying in these circumstances prior to November 1994. Walters and Solis present the affidavit of Commander Albert Rodriguez, which we discussed *supra* at 14-15. The summary judgment depositions of Walters and Solis also indicate that the SAPD never informed them that hog-tying was prohibited or of its dangers in these circumstances.

Substantial evidence, however, appears to contradict these assertions. San Diego mailed copies of San Diego Study to police departments around the nation, including the SAPD, in 1992. Summary judgment record deposition testimony indicates that the SAPD had this study in its possession at the time of Gutierrez's death, putting the SAPD on notice of the possible dangers of hog-tying in these circumstances. The Criminal Law Update article, published in the fall of 1994 by the Texas Office of the Attorney General, notes that "Texas agencies that have banned the use of hog-tying include Dallas, San Antonio, Austin, Corsicana, and the DPS." *See* Garth D. Savage *et al.*, *Sudden Custody Death Syndrome: the Role of Hogtying*," Criminal Law Update, at 11 (Fall 1994)("Criminal Law Update article"). Although the depositions of SAPD representatives call into doubt whether the SAPD had indeed banned hog-tying, just ten days after Gutierrez's death, SAPD Captain Benavides sent officers a memo "reminding" them that the use of a hog-tie on an arrestee was not allowed. The use of the

-18-

word "reminding," particularly in light of the Criminal Law Update article, suggests that the SAPD may have either previously prohibited its officers from hog-tying arrestees or informed its officers that in these circumstances, the use of a hog-tie could prove to be dangerous. The summary judgment record depositions of Solis and Walters further establish that the SAPD neither provided hog-ties to its officers as part of their official equipment nor trained them in their use.[5] It is curious that the SAPD would condone hog-tying without instructing its officers how to use this restraint device properly or the dangers associated with it in these circumstances. Therefore, we find a material dispute of fact to exist on this issue. This dispute is important because it may be difficult to conclude that the officers acted reasonably if they performed an action that had been banned by their department or of whose dangers in these circumstances they had been warned.

Finally, a material dispute of fact exists as to whether Gutierrez posed a threat of death or serious bodily injury to the officers or to others. At various points in the encounter, such as when the officers initially placed Gutierrez in the patrol car and drove into a neighboring parking lot, Gutierrez was quiet and peaceful. Gutierrez's family also points out that other police officers arrived at the scene of the encounter but did not assist

---

[5]    The depositions of Walters and Solis indicate that although the SAPD did not offer formal training on the use of hog-ties, officers used them on a fairly widespread basis. Walters and Solis each owned hog-ties that they purchased from other police officers with their personal funds. The hog-tie used on Gutierrez belonged to Officer Solis.

-19-

Walters and Solis in any way or stick around, thereby suggesting that the other officers did not consider Gutierrez to be violent. However, Gutierrez did kick Lavin in the chest, and Lavin's summary judgment record affidavit describes Gutierrez as "one of the most agitated and violent persons that I have ever seen." Moreover, immediately prior to the hog-tying, Gutierrez was kicking the back of the driver's seat, the metal cage, and the windows of the patrol car with his bare feet, and the depositions of the officers state that they had to restrain his feet "for his safety and ours."

Accordingly, there are many material issues of fact in dispute which ultimately impinge upon our determination as to whether the officers employed reasonable force or excessive (and deadly) force by the manner in which they seized Gutierrez. Viewing these disputed facts in the light most favorable to Gutierrez, the summary judgment record shows that the officers knew that Gutierrez was under the influence of drugs and that they placed him face down in a prone position. Further, the record shows that the SAPD either had prohibited hog-tying or informed its officers of its dangers in these circumstances. The record also shows that Gutierrez did not pose a threat of death or serious physical harm to the officers or to others, for at least some time, perhaps even a significant period of time, meaning that the officers were not justified in using deadly force.

Other facts bearing heavily against the officers are not in dispute. The officers admit that they failed to monitor Gutierrez as they drove toward the hospital, other than occasionally to check

to ensure that his bonds were still secure. *See* San Diego Task Force Study at 12 ("The passenger officer should maintain observation of the prisoner, monitoring his/her color, breathing and level of consciousness."); Criminal Law Update article at 11. They also concede that the rear of the cruiser was darkened and that Solis rode beside Walters in the front of the car, rather than beside Gutierrez where he could have monitored his condition. *See* San Diego Study, at 12 ("During hours of darkness, an internal light source should be used in the police vehicle if needed to provide the passenger officer a clear view of the prisoner at all times."). Neither officer disputes that common and inexpensive alternatives to hog-tying are now and were then available.[6] Neither officer disputes that hog-tying has been largely abandoned by police forces in most large cities across the nation.[7]

---

[6] In *Garner*, the Supreme Court stated that "[w]e would hesitate to declare a police practice of long standing 'unreasonable' if doing so would severely hamper effective law enforcement." 471 U.S. at 19, 105 S. Ct. at 1705 (noting that many alternative methods are available to apprehend unarmed, non-violent fleeing suspects other than shooting). Both the San Diego Study and the Criminal Law Update article point out common and inexpensive alternatives to hog-ties. One device, called the RIPP Hobble, consists of a Velcro strap to restrain the arrestee's feet and a cord to connect the handcuffs and the Velcro strap. Since the arrestee's feet are restrained, the arrestee cannot kick and must sit upright, a position that allows normal breathing. This device sells for approximately eight dollars. Criminal Law Update, at 9-10. The Criminal Law Update article notes that inexpensive flex-cuffs and plastic ties can be wrapped around an arrestee's wrists and ankles and secured to a center post in a patrol car. *Id.* at 10. Assuming *arguendo* that hog-tying is found to be unreasonable by a jury, such a finding therefore may not hamper effective law enforcement.

[7] In *Garner*, the Supreme Court explained that in "evaluating the reasonableness of police procedures under the Fourth Amendment, we have also looked to prevailing rules in

Moreover, unlike a rapidly evolving encounter with a potentially armed suspect in which the officer must react quickly, *see, e.g., Reese v. Anderson*, 926 F.2d 494, 501 (5th Cir. 1991), the officers had time to contact a supervisor to get advice on how to transport Gutierrez. Accordingly, based on the combination of the multiple factual issues in dispute and the evidence weighing against the officers, we cannot determine whether Walters and Solis' conduct was objectively reasonable as a matter of law.[8]

Cases from other circuits, albeit decided subsequently, are not inconsistent.[9] In *Estate of Phillips v. Milwaukee*, 123 F.3d

---

individual jurisdictions." 471 U.S. 15-16, 105 S. Ct. at 1703. After receiving the San Diego Study, police departments nationwide began to ban hog-tying. "At least 70 percent of the nation's largest police departments, including Detroit, New York, and Los Angeles, have banned hog-tying." Criminal Law Update at 11. The article also notes that "Texas agencies that have banned the use of hog-tying include Dallas, San Antonio, Austin, Corsicana, and the DPS," *id.*, although, as we noted above, a material dispute of fact exists as to whether the SAPD had in fact banned hog-tying or warned its officers of its dangers under these circumstances.

[8]     Walters also argues that he cannot be liable for using excessive force because Gutierrez's death did not result "directly and only from the use of force that was clearly excessive to the need." *Johnson v. Morel*, 876 F.2d 477, 480 (5th Cir. 1989) (en banc). Assuming, *arguendo,* that *Johnson* still has viability, *see Harper v. Harris County, Tex.*, 21 F.3d 597, 600 (5th Cir. 1994) ("We now hold that the *Johnson* standard is no longer valid in the wake of *Hudson v. McMillian. . . .*"), Walters' argument is misplaced. We recently interpreted the language that Walters cites only to prohibit compensation for injuries caused by the use of reasonable force. *See Dunn v. Denk*, 79 F.3d 401, 403 (5th Cir. 1996) (en banc) ("A trier of the fact can compensate only for the injury caused by the use of excessive force. There can be no award for injury caused by reasonable force."). Hog-tying is asserted to be excessive force and the addendum to the Autopsy Report lists it as a contributory cause of Gutierrez's death. Therefore, we reject Walter's argument.

[9]     Objective reasonableness is determined by reference to the law as it existed at the time the conduct in question took

-22-

586 (7th Cir. 1997), two police officers attempted to restrain Phillips, an obese person exhibiting psychiatric problems by lowering him to the floor and handcuffing his arms and legs (but not together in a hog-tie). One officer gently put her knee on his back to keep him from rising while they called for a patrol wagon to take him for mental observation at a hospital. The officers continuously monitored Phillip's condition, and when he ceased breathing shortly thereafter, they began resuscitation efforts and revived him, although he died the next day in a hospital. The coroner found that Phillips' medical condition, obesity and positional asphyxia jointly contributed to his death. The Seventh Circuit held the officers' conduct to be objectively reasonable because merely "restraining a person in a prone position with constant monitoring, cannot be characterized, in itself, as 'deadly' force." *Id*. at 593-594. The Seventh Circuit, however, expressly distinguished this factual situation from one in which police hog-tie a person who thereby dies, and stated that a different outcome might have resulted had Phillips been hog-tied. *Id*. The court also noted that Phillips' medical problems were not observable to the naked eye, and that the officers continuously monitored him and quickly began resuscitation efforts.

Similarly, in *Mayard v. Hopwood*, 105 F.3d 1226, 1227-28 (8th Cir. 1997), the Eighth Circuit held police officers' use of a hog-tie to be objectively reasonable. When Mayard, the arrestee,

---

place. *See Harlow*, 457 U.S. at 818-819, 102 S. Ct. at 2738-39. We accordingly discuss these cases only to show that they reach similar results.

became more and more violent, the police handcuffed her and attempted to place her in a patrol car. Once in the car, she began kicking and hitting an officer, to which the officers responded by hog-tying her. Without much explanation, the Eighth Circuit held the officers' conduct to be objectively reasonable, "particularly . . . in light of Mayard's resistance." *Id*. at 1228. The opinion does not state, however, whether she was under the influence of drugs, whether she was placed face-down, or whether she died as a result of being hog-tied.

Finally, in *Price v. San Diego*, 1998 WL 1607 (S.D. Cal. Jan. 8, 1998), a drug-affected arrestee died in police custody after an intense struggle that concluded with the police hog-tying him and placing him in a face-down position. The plaintiffs in that case relied on the San Diego Study and the research of Dr. Donald T. Reay, as does Gutierrez's family in this case. The district court noted that a recent study calls the validity of Dr. Reay's research into question. *See* Tom Neuman et al., *Restraint Position and Positional Asphyxia*, 30 Annals of Emergency Med. 578 (1997). The court further noted that the persuasiveness of Dr. Neuman's study led even Dr. Reay to concede that hog-tying is "physiologically neutral." *Id*. at *5. Accordingly, the district court dismissed all excessive force claims against the officers because "little evidence is left that suggests that the hogtie restraint can cause asphyxia." *Id*. at *4. Because Dr. Neuman's study is not part of the summary judgment record in this case and Walters and Solis have not presented it to this court, however, we have not considered it

-24-

in deciding whether their actions were objectively reasonable. *See Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 (5th Cir. 1992); *Fields v. City of South Houston*, 922 F.2d 1183, 1188 (5th Cir. 1991) (quoting *John v. Louisiana*, 757 698, 710 (5th Cir. 1985)) ("[M]aterials not presented to the district court for consideration of a motion for summary judgment are never properly before the reviewing court.").

In conclusion, our holding today is very limited. Both the San Diego Study and Criminal Law Update article suggest hog-tying may present a substantial risk of death or serious bodily harm only in a limited set of circumstances))*i.e.*, when a drug-affected person in a state of excited delirium is hog-tied and placed face down in a prone position. San Diego Study at 6-10; Criminal Law Update at 7. Whether these circumstances exist in this case is unclear because of the many material disputes of fact. Based on the disputed facts and undisputed facts not favoring the officers, we cannot determine whether their conduct was objectively reasonable. Assuming this case proceeds to trial, however, a very different picture may result than the one painted by the summary judgment record because Gutierrez must prove the issues that this opinion assumes in his favor, and the jury can choose to credit certain facts over others, which we cannot do in reviewing a denial of summary judgment. *See Spann v. Rainey*, 987 F.2d 1110, 1116 (5th Cir. 1993) (noting that a different result may occur on interlocutory appeal from a denial of qualified immunity and at trial because the plaintiff bears the burden of proving facts that

we consider in the light most favorable to him).  Accordingly, we dismiss the officers' appeal from the district court's denial of summary judgment on Gutierrez's Fourth Amendment claim for lack of jurisdiction.[10]  *See Hale v. Townley*, 45 F.3d 914, 918 (5th Cir. 1995) (dismissing interlocutory appeal on a denial of summary judgment on an excessive force claim because disputed material issues of fact made it impossible to determine whether officers' conduct was objectively reasonable); *see also Naylor v. State of La*, *Dep't of Corrections*, 123 F.3d 855, 857 (5th Cir. 1997); *Harper v. Harris County*, 21 F.3d 597, 602 (5th Cir. 1994).

V

The district court also denied summary judgment on Gutierrez's Fourteenth Amendment claim.  "A*ll* claims that law enforcement officers have used excessive force))deadly or not))in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham*, 490 U.S. at 395, 109 S. Ct. at 1871 (emphasis in original). While the Fourth Amendment protects arrestees, once an arrest is complete, pretrial detainees are protected by the due process clause of the Fifth or Fourteenth Amendments. *See Brothers v. Klevenhagen*, 28 F.3d 452, 455–56 (5th Cir. 1994); *Valencia v. Wiggins*, 981 F.2d 1440, 1445 (5th Cir. 1993).  Although the point at which an arrest ends and pretrial

---

[10]    Because disputes of material fact prevent us from determining the objective reasonableness of the officers' conduct, we do not reach their other arguments.

detainment begins is not always clear, *see Valencia*, 981 F.2d at 1449 n.44, we have held that the Fifth or Fourteenth Amendments begin to protect persons "*after* the incidents of arrest are completed, *after* the plaintiff has been released from the arresting officer's custody, and *after* the plaintiff has been in detention awaiting trial for a significant period of time." *Id*. at 1443-43 (emphasis in original).  Thus, in *Brothers*, we found Brothers to be a pretrial detainee protected by the Fourteenth Amendment where he had been arrested, processed by the police department, and spent several hours in jail before the police allegedly used excessive force on him.  28 F.3d at 452.

Walters and Solis seized Gutierrez's person, thereby triggering his Fourth Amendment protections.  Shortly thereafter, Solis and Walters, the very officers who initially seized Gutierrez, hog-tied him.  The hog-tying also occurred relatively close to the spot where the officers seized Gutierrez.  Therefore, we find that Gutierrez enjoyed the protections of the Fourth Amendment.  After a thorough review of Gutierrez's complaint, we find his Fourteenth Amendment claim to be based on the officers' alleged use of excessive force, an alternative basis for recovery to the Fourth Amendment claim.  We accordingly vacate and render a take nothing verdict on the Fourteenth Amendment claim.  *See Graham*, 490 U.S. at 395, 109 S. Ct. at 1871.

## VI

For the foregoing reasons, we DISMISS Walters and Solis' appeal of Gutierrez's Fourth Amendment claim and VACATE and RENDER

a take nothing verdict on his Fourteenth Amendment claim.