# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

———————

m 99-40175

———————

MARY WAGNER,
INDIVIDUALLY AND AS NEXT FRIEND OF
GILBERT GUTIERREZ AND IRMA GUTIERREZ,

Plaintiff-Appellee,

VERSUS

BAY CITY, TEXAS, ET AL.,

Defendant,

ROBERT GARCIA, OFFICER; VICTOR R. HADASH, OFFICER;
RICHARD M. HEMPEL, OFFICER; DAVID MIRELEZ, OFFICER;
SCOTT A. SHERRILL, OFFICER,

Defendants-Appellants.

———————————

Appeal from the United States District Court
for the Southern District of Texas

———————————

September 27, 2000

Before JOLLY, SMITH, and BARKSDALE,
Circuit Judges.

JERRY E. SMITH, Circuit Judge:

This is an appeal of a partial denial of a motion for summary judgment. The appellant police officers argue that qualified immunity pre-

cludes Mary Wagner's 42 U.S.C. § 1983 claims of excessive force and deliberate indifference to the need for medical attention arising from the arrest of her brother, Gilbert Gutierrez, who died in police custody. Concluding that there is no reasonable inference that the officers were objectively unreasonable, we reverse and render judgment for the defendant officers and remand for further proceedings.

## I.

In March 1996, Gutierrez entered a fast-food restaurant in Bay City, Texas, and, using a receipt that belonged to another customer, he requested to be given free food. When he was told he could not have the food, he cursed one of the managers, who was black, and called her a racial epithet. The manager told him to leave and then called the police, who arrived after Gutierrez already had departed.

Gutierrez returned to the restaurant about an hour later; the manager again called the police. This time, Officer Hadash arrived and recognized the man as Gutierrez, whom he approached, and an altercation ensued. According to Hadash, Gutierrez jumped off a stool and started swinging his fists, striking Hadash several times. Hadash apparently did not strike Gutierrez at this time, because he was busy blocking his assailant's blows. Other witnesses also said Gutierrez struck Hadash, and it is undisputed that Hadash and Gutierrez eventually ended up struggling on the floor.

Officer Mirelez arrived and, seeing the fight, tried to assist Hadash. The two officers struggled to restrain Gutierrez, who continued fighting. Although different witnesses provided slightly varying accounts as to the sequence of events, it is undisputed that one or both of the officers dragged Gutierrez outside and sprayed him with pepper spray. It is uncertain how many times he was sprayed or how much spray was used. And although one witness stated that the officers sprayed Gutierrez while inside the restaurant, all other witnesses stated that this occurred after Gutierrez was taken outside.

Next, the officers placed Gutierrez face down on the pavement and eventually were able to handcuff him. According to the officers, Gutierrez was still struggling at that point. But, according to one witness, Maria Juarez, Gutierrez did not appear to be struggling at the time he was dragged outside. Juarez stated that after Gutierrez was taken outside, she watched the incident from the store and saw Gutierrez on the ground, face down, handcuffed.

One of the officers had his knee on Gutierrez's back and "kept pushing Mr. Gutierrez [sic] neck and head to the ground" with a stick. Mirelez confirmed placing his right shin across Gutierrez's back while attempting to restrain Gutierrez. Neither Hadash nor Mirelez mentioned using a baton, however.

After Gutierrez was cuffed, three other officers arrivedSSSergeant Garcia, Officer Hempel, and Officer Sherrill. According to Garcia, when he arrived he observed Hadash and Mirelez on top of Gutierrez. Then, when Sherrill and Hempel arrived, Garcia told them to put Gutierrez into a patrol car. Garcia advised Hadash that Gutierrez could go to the hospital to be decontaminated from the pepper spray, but Hadash declined, because the jail was closer and more secure, and because Gutierrez had been combative.[1]

---

[1] Decontamination consists primarily of
(continued...)

When Sherrill and Hempel arrived, Gutierrez was lying on his stomach and was no longer struggling. The officers had to carry him to place him in the car; he did not walk on his own. The officers placed him in the car head-first. Sherrill had to go to the other side of the vehicle to pull Gutierrez through, placing him on his stomach with his head turned toward the front of the vehicle. Sherrill reported that Gutierrez appeared to have passed out. According to Garcia, he did not attempt to assess whether Gutierrez was injured, nor did he speak to him.

Hadash then drove Gutierrez to the county jail. He recalled hearing "a couple of groans and grunts" during the trip but did not speak to Gutierrez during that time.

When Hadash arrived, he was met by two jailers, who again had to assist Gutierrez out of the car. Gutierrez was not combative; indeed, Hadash did not know whether he was even conscious at that point. The jailers carried Gutierrez into the jail, half dragging him, and laid him face down. At that point, Hadash looked at Gutierrez and told Garcia that it appeared Gutierrez was not breathing.

The officers removed Gutierrez's handcuffs and turned him over, and Hadash began CPR. Once his breathing was revived, Gutierrez was transported to the hospital, where he slipped into a coma and eventually died.

## II.

Gutierrez's sister (Wagner) and his daughter (Irma Gutierrez) sued the city and the officers, alleging violations of Gutierrez's civil rights pursuant to § 1983. The complaint set forth claims of, *inter alia*, excessive force and a failure to respond to Gutierrez's medical needs. Although the original complaint named Bay City and every

male officer of the Bay City police force, the claims eventually were dismissed against all but Bay City and Mirelez, Sherrill, Garcia, Hadash, and Hempel, the officers involved in the arrest.

The officers moved for summary judgment on the basis of qualified immunity, and the court granted summary judgment on the excessive force claims as to Sherrill, Garcia, and Hempel, because they arrived after the altercation was over. The court denied summary judgment in all other respects.

## III.

Wagner argues that with respect to her claim for excessive force,[2] because the district court ruled that neither party had submitted enough evidence about what happened during the course of the arrest to declare whether Hadash and Mirelez were entitled to qualified immunity, we do not have jurisdiction to review this purely factual conclusion. The court stated, preliminarily, that it could not currently say there was no merit to Wagner's claims, and it invited the defendants to raise the summary judgment issue again once additional discovery was taken.

In so ruling, the court pointed to several inconsistencies in the record regarding the altercation between Hadash and Gutierrez, and to inconclusive evidence as to how much pepper spray was used. Thus, it concluded that further discovery would be necessary to determine whether the defendants were entitled to qualified immunity.

---

[1](...continued)
flushing the eyes with water. It can be done at the hospital, at the jail, or even at the scene.

[2] Wagner concedes that we have jurisdiction to review the district court's ruling denying qualified immunity on the denial-of-medical-attention claim, noting that there is very little factual dispute about what the defendants did or did not do in this respect.

3

In deciding an interlocutory appeal of a denial of qualified immunity, we can review the *materiality* of any factual disputes, but not their *genuineness*. *See Colston v. Barnhart,* 146 F.3d 282, 284 (5th Cir.) (on petition for rehearing en banc), *cert. denied*, 525 U.S. 1054 (1998). So, we review the complaint and record to determine whether, assuming that all of Wagner's factual assertions are true, those facts are materially sufficient to establish that defendants acted in an objectively unreasonable manner. Even where, as here, the district court has determined that there are genuine disputes raised by the evidence, we assume plaintiff's version of the facts is true, then determine whether those facts suffice for a claim of excessive force under these circumstances.

Moreover, in light of the fact that the district court did not specifically identify those factual issues as to which it believed genuine disputes remained, we conduct an analysis of the record to determine what issues of fact the district court likely considered genuine. This ensures that the defendants' right to an immediate appeal will not be defeated because of the district court's failure to articulate its reasons for denying summary judgment. *See id.* at 285. It follows that we do have jurisdiction to review the denial of summary judgment on all of these claims.

## IV.

Defendants argue that there is no issue of material fact regarding whether they acted in an objectively unreasonable manner in using the amount of force that they did to subdue Gutierrez and in failing to notice sooner that he was in need of medical attention.[3] We

---

[3] Defendants also argue that Wagner has
(continued...)

examine the various claims in turn.

## A.

With respect to the excessive-force claim, defendants argue that, notwithstanding the district court's assertions to the contrary, there is no issue of material fact about what occurred during Gutierrez's altercation with Hadash and Mirelez. Hadash claims that Gutierrez attacked him and that he merely defended himself by blocking Gutierrez's blows. Although another witness was unable to recall who was the aggressor, nothing about this witness's statement is inconsistent with Hadash's version of the story. Defendants also argue that there is no evidence that the officers used two full cans of pepper spray.

To be sure, there is a slight inconsistency in the sequence of events as reported by the of-

---

[3](...continued)
provided no evidence that the officers' actions, even assuming they form the basis for liability under § 1983, caused Gutierrez's condition. They assert that Wagner did not show or provide any evidence to suggest that the officers were the cause of Gutierrez's condition, and they point out that it is the plaintiffs' burden to establish that his injuries resulted from the defendant officers' actions.

But the district court correctly concluded that Wagner made a plausible argument that Gutierrez's injury directly and exclusively resulted from his altercation with defendants Hadash and Mirelez. A reasonable jury could conclude that the use of pepper spray, combined with the fact that the officers repeatedly pushed him face-first to the ground, could have resulted in Gutierrez's stopping breathing. Perhaps Wagner could have provided expert medical testimony to support her claims, but common sense compels the conclusion that Gutierrez's injuries resulted from his altercation with the police, and there is no requirement that medical testimony be presented to establish causation.

ficers and Wagner's witness, Juarez, and there is some question as to how long the defendants held Gutierrez on the ground, how roughly they treated him, and how much pepper spraySSeven if not two full cansSSwas used. At least one witness said Gutierrez was no longer struggling when the officers dragged him outside, yet they continued to treat him aggressively, allegedly shoving his face to the ground.

We are careful not to engage in second-guessing officers in situations in which they have to make split-second, on-the-scene decisions while confronted with a violent individual.[4] But our qualified-immunity inquiry requires us to determine whether the officers' actions were objectively unreasonable, in light of clearly-established law at the time, and in light of the information the officers possessed. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Qualified immunity thus protects an official whose conduct was objectively reasonable, even if the conduct infringed upon a constitutional right of the plaintiff." *Gutierrez v. City of San Antonio*, 139 F.3d 441, 445 (5th Cir. 1998) (citing *Anderson*, 483 U.S. at 641). Consequently, "even law enforcement officials who reasonably but mistakenly use excessive force are entitled to immunity." *Id.* at 447 (internal citations and punctuation omitted).

In *Gutierrez*, we offered a lengthy discussion of how to determine whether a particular police practice or action was unreasonable excessive force in light of clearly established law. Like the instant case, *Gutierrez* involved the restraint of a suspect who subsequently died, apparently as the result of an improper restraining technique that caused asphyxiation. Because it is highly relevant to our analysis, we reproduce a large portion of the facts of that case to compare and contrast it with the instant appeal:

> The officers observed [Rene Gutierrez] running around in circles in the middle of the street and slipping and falling on his side. As they parked the patrol car and approached Gutierrez, he began swinging his arms wildly and crawling toward them on his hands and knees. Gutierrez shouted out that he had been shot; the officers checked, but found no bullet wounds on Gutierrez or nearby persons with guns. The officers did notice numerous abrasions on his chest and bleeding from his mouth.

> [Officer] Walters cuffed Gutierrez "for his safety and mine." He did not arrest Gutierrez, but police reports indicate that Walters intended to do so later. Walters also noted that Gutierrez's eyes were glassy, he was walking unsteadily, and his speech was slurred. When Walters asked Gutierrez if he had taken any drugs, Gutierrez said that he had "shot some bad coke." Solis later testified that Gutierrez was "exhibiting that he was high on some type of drugs."

> [Officer] Solis called an ambulance ("EMS"), allegedly for a possible toxic ingestion overdose. While waiting for the EMS to arrive, Gutierrez sat calmly

---

[4] *See Graham v. Connor,* 490 U.S. 386, 396-97 (1989) (noting that we do not utilize "the 20/20 vision of hindsight," and that we consider "the fact that police officers are often forced to make split-second judgmentsSSin circumstances that are tense, uncertain, and rapidly evolvingSSabout the amount of force that is necessary in a particular situation").

with his back against a rear door of the patrol car. As traffic in the intersection increased, Walters placed Gutierrez face down in a prone position in the back seat and drove the patrol car into a neighboring parking lot. Gutierrez was quiet and peaceful, and his feet were not restrained in any way.

When the EMS arrived, Walters told EMS Technicians Ernest Lavin and Michelle Cevallos that Gutierrez had admitted to injecting bad cocaine. Lavin and Walters removed Gutierrez from the back seat of the patrol car and walked him toward the EMS vehicle. When Gutierrez got to the rear of the EMS unit, he turned around and sat down. Gutierrez suddenly began to push and tried to get into the EMS vehicle, yelling "put me in." As abruptly, he kicked Lavin in the chest, and shouted "get me out." Due to this violence, Lavin refused to transport Gutierrez to the hospital. Walters then asked Lavin whether Gutierrez could be safely transported in a patrol car, to which Lavin replied that Gutierrez appeared to be having psychiatric problems rather than a reaction to bad drugs.

Walters and Lavin returned Gutierrez to the back seat of the patrol car to transport him to a local hospital for examination, allegedly placing him face down in the back seat. Gutierrez began to kick the back of the driver's seat, the metal cage, and the windows of the patrol car with his bare feet. Walters and Solis agreed that Gutierrez's legs would have to be restrained, "for his safety and ours." Solis got his personal leg-restraint device from the patrol car, a ny-

lon rope with a loop on one end and a clasp on the other (a "hog-tie"). Walters placed the loop around Gutierrez's feet, and Solis linked the clasp around the handcuffs, drawing Gutierrez's legs backward at a 90-degree angle in an "L" shape, thereby "hog-tying" him. Whether the officers then placed Gutierrez in a face down position on the rear seat or with his face pointed toward the rear of the front seat is disputed, but as the officers set off for the hospital, he was conscious and struggling.

Walters and Solis drove to the hospital at a normal rate of speed with their lights and sirens off and the rear of the patrol car darkened. While Walters drove, Solis occasionally checked to see if Gutierrez's restraints were secure, but he did not check to see if Gutierrez was still breathing or otherwise monitor him. Approximately ten minutes into the journey, all sounds of Gutierrez struggling stopped. Upon arriving at the hospital, Walters went into the hospital to summon medical personnel while Solis, believing Gutierrez to be asleep, began to nudge him. At that time, Gutierrez was face down on the seat, a position that allegedly restricted the amount of oxygen that could reach his heart and his heart's ability to pump oxygen-enriched blood throughout his body. Medical personnel came out to the car, the restraints were removed, and the medical personnel discovered that Gutierrez did not have a pulse. They then took him into the emergency room where doctors pronounced him dead.

*Id.* at 443.

6

In *Gutierrez*, we began our analysis by addressing the officers' claims for qualified immunity based on the fact that there was no clearly-established law at the time that specifically held that hog-tying constituted excessive force. We stated that "[s]uch a dogmatic argument is unjustified." *Id.* at 445. Rather, we noted that "[i]n *Anderson,* the Supreme Court stated that whether a clearly established right has been violated 'substantially depends upon the level of generality at which the relevant "legal rule" is to be identified.'" *Id.* (quoting *Anderson*, 483 U.S. at 639). What was required to overcome a claim of qualified immunity, then, was not that the specific police action had been held unlawful, but only that it be apparent "in the light of pre-existing law" that such action would be unlawful. *Anderson*, 483 U.S. at 640.

Next, we noted the difficulty the lower courts have had in deciding which various police tools, instruments, and actions should be characterized as "deadly force," a subset of excessive force, or force "carrying with it a substantial risk of causing death or serious bodily harm." *Gutierrez*, 139 F.3d at 446 (internal citations and punctuation omitted). With respect to the specific practice of hog-tying, we noted that while there were no cases that held such police procedure unlawful, the San Diego Police Department had issued a well-circulated report that warned of the dangers of Sudden Custody Death Syndrome ("SCDS").

That report concluded that SCDS could be caused by the combination of "(1) drug use, (2) positional asphyxia, (3) cocaine psychosis, and (4) hog-tying or carotid choke holds." *Id.* Because there were material fact disputes as to whether all four of these conditions exist-

edSSor at least with respect to whether the officers were aware that all of the conditions existedSSand because there was a material fact dispute about whether the San Antonio Police Department had made its officers aware of the SCDS report, in *Gutierrez* we held that these issues made it impossible to determine whether the officers' actions were objectively reasonable, thereby precluding summary judgment on their qualified immunity defenses.

We contrasted *Estate of Phillips v. Milwaukee,* 123 F.3d 586 (7th Cir. 1997), in which that court held that two officers had not been objectively unreasonable where the suspect they restrained died as the result of asphyxia. Two police officers attempted to restrain Phillips, an obese man exhibiting psychiatric problems, by lowering him to the floor and handcuffing his arms and legs (but not together in a hog-tie). One officer gently put her knee on his back to keep him from rising while they called for a patrol wagon to take him to a hospital for mental observation.

The officers continuously monitored Phillip's condition, and when he ceased breathing shortly thereafter, they began resuscitation efforts and revived him, although he died the next day in the hospital. The coroner found that Phillips's medical condition, obesity, and positional asphyxia jointly contributed to his death.

The *Phillips* court held the officers' conduct to be objectively reasonable, because merely "restraining a person in a prone position with constant monitoring, cannot be characterized, in itself, as 'deadly' force." *Id.* at 593-94. In *Gutierrez*, we noted that the *Phillips* court had expressly distinguished this

7

factual situation, however, from one in which police hog-tie a person who subsequently dies. *See Gutierrez*, 139 F.3d at 451.

*Gutierrez* therefore presents us with several yardsticks by which to measure Wagner's claim for excessive force, and it is also highly relevant to the claim for denial of medical assistance. First, and perhaps most importantly, as defendants note, Gutierrez was not "hog-tied," and, as a result, the "very limited" holding of *Gutierrez* cannot support a finding that Hadash and Mirelez violated clearly-established law when they handcuffed Gilbert and placed him in the patrol car.

Likewise, several of the other required conditions in the SCDS report are not present here, including the fact that there is no evidence Gutierrez was a drug user, much less that there was a risk of "cocaine psychosis." Thus, although there arguably is support in *Gutierrez* for the concept that in this case there was a substantial risk of harm from positional hypoxia,[5] that theory cannot serve as the basis for Wagner's claim that the officers violated clearly established law and behaved unreasonably, because the other three SCDS factors plainly were not present.

Instead, this case resembles, in several respects, *Phillips*, in which that court held that the officers' restraint of the suspect was not objectively unreasonable, even where he subsequently died of asphyxiation. Although there is not as much evidence here of "constant monitoring" of Gutierrez's breathing and medical condition, defendants did state that they heard him groaning during the trip to the police station and thus had reason to believe he was still breathing. And, unlike the plaintiff's obesity in *Phillips*SSa fact, according to the doctors, that contributed to his risk of harm and that the officers could easily observeSShere there were no apparent physical signs that Gutierrez was substantially at risk.

In addition, defendants point out that nothing about the use of chemical spray or even a choke-hold was objectively-unreasonable conduct where the suspect physically resisted arrest.[6] The officers' actions were all consistent with the idea that they merely were trying to restrain a violent individual.

Thus, those actions were objectively reasonable in the context of this dangerous situation that Gutierrez created, and we therefore reverse the denial of summary judgment on the excessive-force claim. Even accepting all of Wagner's pleaded facts as

---

[5] Although the defendants here argue that Gutierrez was placed on his stomach, with his head facing forward, not down, the court in *Gutierrez* noted that "[e]ven if the jury concludes that the officers placed Gutierrez on his side, it may still conclude that the officers' failure to monitor him . . . amounted to deliberate indifference, thereby permitting Gutierrez to roll into a face down position during the time that the officers transported him to the hospital." *Id.* at 448 n.4. Moreover, it is not evident whether the person needs to be face down to be in danger of asphyxiation, since the SCDS report seems to suggest that it is the fact that "all of their weight is concentrated on their chest, thereby interfering with the mechanical process of inhalation and exhalation" that is problematic. *Id.* at 448.

[6] *See Gassner v. City of Garland,* 864 F.2d 394, 400 (5th Cir. 1989) (upholding use of a choke-hold); *Baldwin v. Stalder*, 137 F.3d 836, 840-41 (5th Cir. 1998) (upholding use of chemical spray).

true, there is no issue of material fact on this claim.

## B.

A pretrial detainee's constitutional right to medical care, whether in prison or other custody, flows from the procedural and substantive due process guarantees of the Fourteenth Amendment.[7] Liability for failing to provide such care attaches if the plaintiff can show that a state official acted with deliberate indifference to a substantial risk of serious medical harm and that injuries resulted. *Hare*, 74 F.3d at 647-48. "Deliberate indifference" requires that the official have *subjective* knowledge of the risk of harm. *Id.* at 650. Mere negligence will not suffice, and "[d]eliberate indifference, i.e., the subjective intent to cause harm, cannot be inferred from a . . . failure to act reasonably." *Id.* at 649 (citations omitted).

Thus, for Wagner to prevail on her claim of deliberate denial of medical care, she needs to establish more than the typical quantum of evidence necessary to overcome a qualified immunity defense. That is, she must show not only that the defendants' actions in failing to provide Gutierrez medical attention before he arrived at the jail were objectively unreasonable, but also that defendants intended the consequence of those actions.

Because the risk of harm from asphyxiation, of which Wagner alleges defendants should have been aware, primarily was the result of Gutierrez's being handcuffed and placed on his chest in the back of the patrol car, *Gutierrez*

again informs our analysis as to the objective reasonableness of the officers' actions. As noted with respect to the excessive force claim, clearly-established law did not put the officers on notice that this type of restraint would lead to the medical problems Gutierrez eventually suffered. At most, one of the four required criteria for SCDS was present, and even then there is no evidence that Gutierrez was actually placed face-down in the patrol car as would be required by the positional-asphyxia prong.

As a result, because Wagner has failed to establish even that the officers were objectively unreasonable in their treatment of Gutierrez, *a fortiori* there is no way she can prevail on a claim that defendants intended to harm him. She offers no evidence that would refute Hadash's claim that he heard Gutierrez moaning during the short trip to the jail (indicating that he was still breathing), and she provides no reason to question the veracity of the officers' testimony that as soon as they discovered Gutierrez had stopped breathing, Hadash immediately began CPR.[8]

---

[7] *See Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc) (comparing such right to a prisoner's Eighth Amendment right to be free from cruel and unusual punishment).

[8] Perhaps Wagner could have provided expert medical testimony that would refute a claim that Hadash began resuscitation efforts shortly after Gutierrez stopped breathing, but she did not offer any such evidence. And while the district court felt that discovery in addition to the affidavits and depositions already produced would help illuminate the actual sequence of events that occurred during Gutierrez's altercation with Officers Hadash and Mirelez, the medical information that could have helped Wagner's denial-of-medical-care claim was information entirely within her control from the outset of this case. Moreover, even Wagner concedes that the factual record with respect to this claim is well-established and not in dispute.

(continued...)

Indeed, according to the undisputed evidence, Hadash's recuperative efforts continued until the EMS arrived at the jail, and Gutierrez was revived, though he later slipped into a coma. As defendants persuasively argue, these "actions are a far cry from the deliberate indifference required to establish liability."

The district court was troubled by the fact that the officers on the scene took little or no actions to evaluate Gutierrez's medical condition before transporting him to the jail. It also felt that defendants would be hard-pressed to establish a legitimate governmental interest in not taking Gutierrez to the hospital for decontamination of the pepper spray, opining that because he was apparently unconscious at the time, therefore he no longer posed a continuing threat that required that he be transported directly to the jail. This decision was particularly worrisome to the court, because Hadash allegedly ignored Garcia's suggestion that Gutierrez be taken to the hospital.

But again, the district court's observations are made through the lens of 20/20 hindsight. Garcia's suggestion that Gutierrez be taken to the hospital was based *solely* on a need to decontaminate the effects of the pepper spray. The undisputed record establishes, however, that such decontamination effectively could occur in any number of places, including the jail, the hospital, or even on the scene.

Importantly, there is no suggestion in the record that the delay in the decontamination caused Gutierrez to stop breathing; indeed, the evidence is that the jail was closer than the hospital. Because decontamination was the only reason Garcia suggested the hospital as an alternative destination, then, nothing else about his statement should imply that defendants had knowledge that Gutierrez was in need of any other immediate medical attention.

While we are required to make all reasonable inferences in favor of the non-movant, here there is simply a dearth of evidence suggesting that defendants had subjective knowledge and a deliberate indifference to Gutierrez's needs. Accordingly, even if we accept all of Wagner's factual assertions as true, she still has failed to show an issue of material fact regarding deliberate indifference to Gutierrez's need for medical attention, and the district court erred in refusing summary judgment on this claim as well.

The order appealed from, denying summary judgment, is REVERSED, and judgment is RENDERED for the defendant officers, and this matter is REMANDED for further proceedings.

---

[8](...continued)
Thus, we are not required to make any inference that such medical evidence exists or would be discoverable; the record simply is silent in this respect. Consequently, Wagner has failed to create a material fact dispute as to whether Hadash immediately began resuscitation efforts.