REVISED October 28, 2009

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 28, 2009

Charles R. Fulbruge III
Clerk

No. 08-60516

ALICE LOGGINS HILL, as Administratrix of the Estate of
Debbie Denise Loggins, Deceased

Plaintiff-Appellant

v.

CARROLL COUNTY, MISSISSIPPI; CARROLL COUNTY SHERIFF'S
DEPARTMENT, a Division of Carroll County, Mississippi; DONALD GRAY,
in his Official Capacity as Sheriff of Carroll County; MICHAEL SPELLMAN,
Individually and in his official capacity as Chief Deputy Sheriff of Carroll
County; CHARLES JONES, Individually and in his official capacity as Chief
Deputy Sheriff of Carroll County; DAVID MIMS, Individually and in his
official capacity as Deputy Sheriff of Carroll County

Defendants-Appellees

Appeal from the United States District Court
for the Northern District of Mississippi

Before JONES, Chief Judge, and STEWART and SOUTHWICK, Circuit Judges.

EDITH H. JONES, Chief Judge:

Alice Loggins Hill ("Hill"), as administrator of Debbie Denise Loggins's

("Loggins") estate, sued several police officers and Carroll County, Mississippi,

under 42 U.S.C. § 1983 for claims arising out of her daughter's death while she

was being driven to jail. She appeals the district court's grant of summary

judgment in favor of the defendants. With no evidence presented that Loggins's constitutional rights were violated, we affirm the district court.[*]

## I. BACKGROUND

Shortly before 6:00 am on September 17, 2005, Carroll County Sheriff's Department Chief Deputy Michael Spellman ("Spellman") and Deputy David Mims ("Mims") responded to a call about a fight between two women. Spellman arrived first and found Debbie Loggins holding Patricia McChristian ("McChristian") in a headlock. When Loggins refused to release McChristian, Spellman attempted to handcuff her. Loggins, who stood five foot four inches tall and weighed 220 pounds, released McChristian but attacked Spellman, forcing him to the ground. She seized the deputy's flashlight and pummeled him about the head and shoulders.

Spellman managed to knock the flashlight away from Loggins and eventually handcuffed her wrists behind her back. She kicked and cursed at the deputy. Spellman retrieved leg restraints from his patrol car and attached them. When Deputy Mims then arrived on the scene, both officers tried to load Loggins into the patrol car. She continued to kick, twist, and otherwise resist the deputies. After they failed several times to deposit her in the car, Spellman placed Loggins in four-point restraints,[1] linking her leg restraints to her handcuffs with an additional set of handcuffs. Spellman and Mims then lifted Loggins into the back seat of Mims's vehicle.

---

[*] Judge Stewart concurs in the result of this opinion only. Judge Stewart would hold that on the record before us, the individual sheriff's deputies did not violate "clearly established" constitutional rights of Ms. Loggins in the manner in which they subdued and transported her, and they are therefore shielded by qualified immunity even if they erred in using excessive force in the first instance. See Pearson v. Callahan, __ U.S. __, 129 S.Ct. 808, 815 (2009). He would also affirm the district court's grant of summary judgment to the County.

[1] This type of restraint, binding the arms and legs together behind the back with an additional set of handcuffs, is also known colloquially as "hog-tying."

The two deputies drove to the Carrollton courthouse, where they met Deputy Charles Jones ("Jones"), who would transport Loggins to jail in Grenada, about 29 miles north. They transferred the still-fighting Loggins from Mims's vehicle to Jones's. Loggins's spirited movements caused Jones's car to rock and shake.

Taking the facts in the light most favorable to Hill, Loggins rode face-down in the back of Jones's air-conditioned car during the half-hour ride to the jail. At some point during the trip, Loggins became quiet and, unbeknownst to Jones, may have stopped breathing. On arrival, Jones left the car to request assistance with Loggins. When a corrections officer accompanied Jones back to the car, they found Loggins unresponsive and without a pulse. They began CPR and notified the emergency medical service. Loggins was rushed to the Grenada Lake Medical Center, but tragically, she was pronounced dead at 7:37 a.m.

The exact cause of Loggins's death is unclear. Her body temperature at the time of death was recorded at 107.5°F, an elevation consistent with the official autopsy diagnosis of fatal hyperthermia. Loggins was also obese and hypertensive; it is undisputed that neither drugs nor excessive alcohol were present in her system. A note in the coroner's chart suggests that blood work should be done to rule out positional asphyxia SSbut no relevant test reports are in the record. Finally, Hill's expert Dr. Spitz opined, based on the abbreviated medical records and autopsy report, that Loggins died from positional asphyxia (suffocation). For present analytical purposes, we must assume she died of the cause asserted by Dr. Spitz.

Hill sued all three deputies, Sheriff Donald Gray, and Carroll County under § 1983 for violations of Loggins's Fourth Amendment rights. The district court granted motions for summary judgment in favor of the defendants, finding the officers were entitled to qualified immunity and the County not liable for a variety of reasons. Hill appeals.

Although she characterizes the entire incident as an unreasonable seizure violating the Fourth Amendment, Hill challenges two distinct actions by the officers: the initial decision by Deputies Spellman and Mims to place Loggins in four-point restraints and the failure of Deputy Jones to monitor Loggins adequately during transport. Hill additionally contends that Carroll County is liable under Monell for ratifying the deputies' conduct, maintaining an unconstitutional custom or policy, and failing to provide sufficient training. See Monell v. Dep't of Social Servs., 436 U.S. 658, 98 S. Ct. 2018 (1978).

## II. STANDARD OF REVIEW

We review the grant of summary judgment de novo, applying the same standards as the district court. Mack v. City of Abilene, 461 F.3d 547, 555 (5th Cir. 2006). In evaluating a motion for summary judgment, the court must view all disputed facts and inferences in the light most favorable to the non-movant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348 (1986). Summary judgment must be granted if "there is no genuine issue as to any material fact and [the court finds] that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). No genuine issue as to any material fact exists where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986).

## III. DISCUSSION

### A. Four-Point Restraints

Hill alleges that the deputies violated Loggins's Fourth Amendment rights by using excessive force during Loggins's arrest. To recover, she must show: (1) an injury (2) which resulted from the use of force that was clearly excessive to the need and (3) the excessiveness of which was objectively unreasonable. Williams v. Bramer, 180 F.3d 699, 704 (5th Cir. 1999). To determine whether

the force used by officers is unreasonable, the Fourth Amendment prescribes a case-specific balancing exercise in which "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest . . ." all play a part. Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865 (1989). The Court in Graham explains the necessary perspective in evaluating the use of force:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

Graham v. Connor, 490 U.S. 386, 396–97, 109 S. Ct. 1865 (1989). Further, only the objective reasonableness of force matters for Fourth Amendment purposes—an officer's subjective motivation and intent are irrelevant. Id. at 397. The court must measure the force used under the facts as a reasonable officer would perceive them, not necessarily against the historical facts. See Reese v. Anderson, 926 F.2d 494, 501 (5th Cir. 1991) (finding no Fourth Amendment violation where an officer shot and killed an unarmed suspected who the officer reasonably believed to be armed). For that reason, when reviewing a grant of summary judgment in the Fourth Amendment context, after first construing disputed historical facts in favor of the non-movant, the court must then ask how a reasonable officer would have perceived those historical facts.

Even if Hill establishes a violation of Loggins's Fourth Amendment rights, the deputies can claim qualified immunity unless they violated constitutional rights that were "clearly established" at the time of their conduct. Pearson v. Callahan, ___ U.S. ___, 129 S. Ct. 808, 815–16 (Jan. 19, 2009).

Because no material facts are in dispute except the cause of Loggins's death (which we assume to be positional asphyxia), we hold that no reasonable jury could have found that the deputies used excessive force to subdue Loggins. This conclusion relieves the deputies as well as Carroll County of § 1983 liability.

Hill's burden was to create a triable fact issue that four-point restraints, which are after all a variety of handcuffing, pose such a serious risk of inflicting death by positional asphyxia that the method is necessarily or frequently disproportionate to the need to restrain an arrestee. She then had to create a material fact issue as to the unreasonableness of the deputies' use of such force against Loggins in these particular circumstances.

To carry her burden, Hill relies on this court's decision in Gutierrez v. City of San Antonio, 139 F.3d 441 (5th Cir. 1998); on the "San Diego Study" concerning four-point restraints; and on testimony of police procedure expert, George Kirkham and forensic pathologist, Dr. Werner Spitz.[2] She also notes that a number of law enforcement agencies have banned or limited this method of prisoner control.

The origin of concern about four-point restraints is a study conducted for the San Diego Police Department by Dr. Arnold Reay, which concluded that "hog-tying" may create a substantial risk of death or serious bodily injury when a combination of (1) drug use, (2) positional asphyxia, (3) cocaine psychosis, and (4) hog-tying or carotid choke hold is present. Final Report of the Custody Death Task Force (unpublished, June 1992), cited in Gutierrez, 139 F.3d at 446. See also Donald T. Reay, et al., Position Asphyxia during Law Enforcement

---

[2] When the court ruled on the deputies' summary judgment motions, it had only affidavits of Kirkham and Dr. Spitz before it. They were later deposed in connection with Loggins's claim against the County. This opinion has incorporated a review of the deposition testimony. Objections to the admissibility of Dr. Spitz's testimony have not been preserved on appeal.

Transport, 13 AM. J. FORENSIC MED. PATHOLOGY 90 (1992); Donald T. Reay, et al., Effects of Positional Restraint on Oxygen Saturation and Heart Rate Following Exercise, 9 AM. J. FORENSIC MED. PATHOLOGY 16 (1988). In Gutierrez, this court found material fact issues barred summary judgment in favor of arresting officers "when a drug-affected person in a state of excited delirium is hog-tied and placed face down in a prone position." Gutierrez, 139 F.3d at 451. The arresting officers were allegedly aware of the San Diego Study, and they were allegedly aware that the arrestee met its criteria. Gutierrez does not hold four-point restraint a per se unconstitutionally excessive use of force, nor does it extend beyond its facts as a mirror of the then-unchallenged San Diego Study.[3] See Wagner v. Bay City, Texas, 227 F.3d 316 (5th Cir. 2000).[4] Taken on their own terms, neither the San Diego Study nor Gutierrez raises a triable fact issue in this case where there is no evidence of drug abuse or drug-induced psychosis.

The testimony of expert witness Kirkham criticizes the deputies for using four-point restraints based on anecdotal evidence of in-custody prisoner deaths and his understanding of the San Diego Study. Kirkham conceded, however, that he was not qualified to give a medical opinion of the physiology that may cause positional asphyxia to result from hog-tying, nor could he estimate the risk of death associated with four-point restraints compared with other forms of prisoner control. At most, Kirkham explained that the deputies had other options available and applying four-point restraints was therefore unnecessary:

> Q. Well, wouldn't [the attempts to place Loggins in the vehicle with just leg restraints and handcuffs] be important to your

---

[3] A more recent study by Dr. Tom Neuman casts doubt on the conclusions of the San Diego Study. Tom Neuman, et al., Restraint Position and Positional Asphyxia, 30 ANNALS OF EMERGENCY MEDICINE 578 (1997).

[4] Wagner points out that this court has upheld the use of choke holds or pepper spray as constitutionally permissible methods of restraint. Wagner, 227 F.3d at 324, n.6., citing cases.

> understanding of when they decided to [link the wrist and ankle cuffs]?
>
> . . .
>
> A.    All I'm saying is, look—and I've loaded my share of resistive prisoners in the back of patrol cars. And I know it's difficult to get them in sometimes. But they should have been able—two officers should have been able to get her in the back. You know, one that pushes her in, the other one drags her through, which is pretty much what they did. Then you—but you don't leave her on her belly, and you don't leave her hog-tied.
>
> . . .
>
> Q.    She can create a full L shape [by bending at the waist], correct?
>
> A.    Yeah, but you can simply pull her leg—one person pulls her legs back while the other person goes around and pulls—grabs the forward part of her body and pulls her in. Then you straighten her up and belt her in there.

The mere existence of alternatives —admittedly more difficult for the officers or more risky for Loggins—is not probative of the excessiveness of four-point restraints.[5]

Dr. Werner Spitz, Hill's medical expert, also failed to provide the necessary evidence of the risks associated with four-point restraints. He relied heavily on the San Diego Study, while acknowledging the existence of the later Neuman study that raises doubts about its conclusions. He admitted Loggins did not exhibit evidence of drug abuse or cocaine-induced psychosis, two critical factors in the San Diego Study. He conceded his own publication on positional asphyxia observes that when deaths occurred, the arresting officers had placed pressure

---

[5] Kirkham's discussion of other control plays a limited but important role in Hill's proof by showing that forbidding this practice would not unduly restrict police. See Tennessee v. Garner, 471 U.S. 1, 19, 105 S. Ct. 1694 (1985)("we would hesitate to declare a police practice of long standing 'unreasonable' if doing so would severely hamper effective law enforcement.") But this testimony does not relate to whether the restraint was excessive, only to whether it was necessary.

on the back of the hog-tied prisoner. No vertical pressure was applied to Loggins. He declined to estimate or refer to any statistical proof of the physical danger associated with four-point restraints.

While characterizing the restraints as dangerous when applied to a morbidly obese woman, Dr. Spitz could not cite a single journal or report supporting this position. His conclusional analysis is simply that a five-foot-four inch person weighing 200 pounds who is conveyed on her stomach in a police car while she endures four-point restraints would "stand a good chance" of dying. Nevertheless, he conceded that even Dr. Reay acknowledges that four-point restraints are "physiologically neutral." In sum, Dr. Spitz admitted that his diagnosis depended, in the absence of any pathological findings, on the circumstances surrounding Loggins's death. He found Loggins's case to be "unique".

Dr. Spitz's testimony fails to raise a material fact issue that the use of four-point restraints was objectively unreasonable. On the general level, he offered no quantification or studies showing, apart from the specific circumstances of the San Diego Study, that four-point restraint is inherently dangerous to arrestees who are not drug abusers exhibiting cocaine-induced psychosis. Nor did he explain why four-point restraints are inherently dangerous apart from the critical factor described in his own book, the "loading" or placing of pressure on the hog-tied individual's arms, shoulders or back. WERNER SPITZ, ET AL., MEDICOLEGAL INVESTIGATION OF DEATH 830-33 (4th ed. 2005). Whether four-point restraints are generally excessive in the circumstances described by these publications is a debate for another day, however,[6] because this case presents none of the additional contributing or associated factors that cast doubt on the propriety of the restraints. A jury could

---

[6] See Price v. County of San Diego, 990 F.Supp 1230 (S.D. Cal. 1998) (complete discussion of physiological consequences of hog-tying.

not extrapolate from these publications an inference that applying four-point restraints to Loggins was inherently dangerous.

Dr. Spitz's analysis of Loggins's case demonstrates at most that her body reacted in a "unique" way to the restraints. This testimony is insufficient to create a fact issue as to the objective reasonableness of the deputies' actions. The deputies cannot be held responsible for the unexpected, albeit tragic result, of their use of necessary force. Judged from the perspective of an officer at the scene of Loggins's arrest and transportation, as Graham, supra, requires, the deputies had no objective basis not to use four-point restraints. Dr. Spitz's criticism, founded on the singularity of Loggins's death, is just the sort of hindsight that Graham cautioned against.

On the other side of the excessive force ledger, the sheriff's office was called in because Loggins was in a fight. She refused to turn loose of her victim voluntarily. She fought with Deputy Spellman, assaulted him with his own flashlight and physically taxed two deputies as they restrained her legs and repeatedly tried to put her in a squad car before they resorted to four-point restraints. She continued to squirm, kick and twist even after being hog-tied. This level of demonstrated violence required stern control measures.

A thorough review of the trial court record persuades us that summary judgment was warranted on Hill's excessive force claim. She failed to develop a material fact issue that the deputies' use of four-point restraints was unnecessary, excessively disproportionate to the resistance they faced, or objectively unreasonable in terms of its peril to Loggins. This holding should not be read to condemn or condone the use of four-point restraints. We conclude only that Hill did not meet her burden of proof in this case.

B. Failure to Monitor

Hill includes failing to monitor Loggins within her Fourth Amendment unreasonable seizure claim. Kirkham, her police procedure expert,

characterized the transport of Loggins from Carrollton to Grenada as "the thing that's most singly critical in terms of the events that occurred." He asserted that, rather than being driving on her stomach in four-point restraint, Loggins should have been calmed down by an officer and an officer should have ridden in the back seat with her during transport.

This claim sounds not in the Fourth Amendment but in the Fourteenth. See Nerren v. Livingston Police Department, 86 F.3d 469, 473 (5th Cir. 1996) ("[a]fter the initial incidents of a seizure have concluded and an individual is being detained by police officials but has yet to be booked, an arrestee's right to medical attention, like that of a pre-trial detainee, derives from the Fourteenth Amendment"). Although the panel in Gutierrez suggests otherwise, 139 F.3d at 452, a later panel of this court cannot overrule an earlier panel decision. Harvey v. Blake, 913 F.2d 226, 228 n.2 (5th Cir. 1990); see also Wagner, 227 F.3d at 324-25 (applying Fourteenth Amendment). Nerren, as the earlier decision, therefore controls. The claim for failure to monitor is, at its heart, the failure to provide medical attention due to insufficient monitoring.

With the constitutional basis for the claim clarified, we briefly address the merits. The standard for this claim is well-established: the plaintiff must show that an officer acted with subjective knowledge of a substantial risk of serious medical harm, followed by a response of deliberate indifference. Nerren, 86 F.3d at 473. Although Hill's evidence might imply negligence by Deputies Spellman, Mims and Jones, she submitted no evidence that they possessed subjective knowledge that their chosen method of transporting Loggins posed a substantial risk of serious medical harm. No evidence contradicts Deputy Jones's testimony that he did monitor her while driving to the jail and he could hear her in the back seat muttering or talking for at least half the journey to Grenada. No evidence supports a fact issue that the deputies acted with deliberate indifference toward Loggins at any time.

11

For the foregoing reasons, Hill has not created a genuine issue of material fact concerning the existence of a constitutional violation; we need not address the deputies' qualified immunity or the county's liability under Monell. The district court's judgment in favor of the defendants is AFFIRMED.