# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 31, 2012

Lyle W. Cayce
Clerk

No. 11-30112

ABDUL S. KHAN; HAJERA T. KHAN,

Plaintiffs - Appellants,

v.

NEWELL NORMAND, as successor to Harry Lee, in his official capacity as Sheriff of Jefferson Parish; TIM STIERWALD, Deputy; JOHN O'BRIEN, Deputy; SERGEANT ASHCROFT; S. TRAPANI, Deputy; R. MARX, Deputy; J. HECK, Deputy; D. DIONDOLILLO; J. ALVARADO, Deputy; R. DYKES, Deputy; K. RICHARDSON, Deputy; S. HARTLEY; R. MILES, Deputy; JOSEPH HAUTH, Doctor; RICKY BURNS, R.N.; EAST JEFFERSON GENERAL HOSPITAL,

Defendants - Appellees.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before BARKSDALE, GARZA, and ELROD, Circuit Judges.

PER CURIAM:

Abdul and Hajera Khan filed this lawsuit under 42 U.S.C. § 1983 for claims arising out of their son's death. The district court granted summary judgment on the basis of qualified immunity against their claims that law enforcement personnel used excessive force in restraining him. The Khans appealed and argue that the use of a four-point restraint in this case was

excessive force and the defendants were not entitled to qualified immunity. We AFFIRM.

## I.

Late on July 17, 2007, Nayeem Khan, who suffered from a mental illness, began running around inside a Winn-Dixie store at closing time and screaming that people outside were trying to kill him. The store's private security guard asked repeatedly that Khan stop, and store employees called for the police. In the meantime, the security guard and an off-duty deputy subdued and handcuffed Khan with his hands in front of his body.

Arriving on the scene, the police officers escorted Khan out of the Winn-Dixie. Khan forcefully resisted his removal from the store; thrashing his legs; attempting to bite; and, according to one officer, reaching for an officer's gun belt. Outside the store, the officers moved the handcuffs to behind his body, and Khan continued to thrash and kick. The officers then hobbled his legs and linked the leg irons and handcuffs with an additional set of handcuffs into a four-point restraint.[1] Almost immediately thereafter, the officers noticed Khan stopped breathing. The officers removed the hand and leg restraints and administered CPR until an ambulance arrived. Khan began to breathe again by the time he arrived at the hospital, but he died later that night.

Khan's parents sued the police officers, alleging constitutional claims for excessive force under 42 U.S.C. § 1983 and state tort claims. Under step one of the qualified immunity analysis, the district court concluded that the officers did not use excessive force. In doing so, the district court compared the facts in this case to those in two Fifth Circuit cases involving four-point restraints and claims

---

[1] "This type of restraint, binding the arms and legs together behind the back with an additional set of handcuffs, is also known colloquially as 'hog-tying.'" *Hill v. Carroll Cnty.*, 587 F.3d 230, 232 n.1 (5th Cir. 2009). The government points out that most of the testimony and several undisputed facts suggest that the officers never linked the handcuffs and leg irons. However, the district court found that one officer's testimony is to the contrary, creating a factual dispute that must be resolved in favor of the plaintiffs at this stage of the proceedings. Consequently, we assume that the officers placed Khan in the four-point restraint.

of excessive force.  *See Hill v. Carroll Cnty.*, 587 F.3d 230 (5th Cir. 2009); *Gutierrez v. City of San Antonio*, 139 F.3d 441 (5th Cir. 1998).  The district court dismissed the federal claims for excessive force, and then declined to exercise supplemental jurisdiction over the remaining state law claims.  This appeal followed.[2]

## II.

We review a grant of summary judgment *de novo*, applying the same standard as the district court.  *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 638 (5th Cir. 2012).  When evaluating a motion for summary judgment, we view all disputed facts and inferences in favor of the non-movant.  *Hill*, 587 F.3d at 233.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Qualified immunity protects government officials from money damages unless a plaintiff shows: (1) the official violated a statutory or constitutional right; and (2) the right was clearly established at the time of the challenged conduct.  *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011).  Courts "have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first."  *Id.*  Because the second prong is dispositive here, we begin our analysis with whether the right was clearly established.

To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  The appellants argue that a four-point restraint can sometimes amount to excessive force that is objectively unreasonable.  *See Gutierrez*, 139 F.3d at 451.  However, the use

---

[2] Although the Khans initially sued the Jefferson Parish Sheriff and thirteen law enforcement officers, the plaintiffs only challenge on appeal the summary judgment as to seven of the deputies: Tim Stierwald, S. Trapani, R. Marx, D. Diondolillo, J. Alvarado, R. Dykes, and K. Richardson.

of a four-point restraint does not constitute excessive force *per se*. *See Hill*, 587 F.3d at 237. Therefore, we examine our case law to see whether the alleged unlawfulness of Khan's treatment would have been apparent to a reasonable official. *Anderson*, 483 U.S. at 640.

This court has held that a four-point restraint in a "limited set of circumstances" may constitute excessive force. *Gutierrez*, 139 F.3d at 451. In *Gutierrez*, the police officers approached Rene Gutierrez shortly before midnight as he was running in circles in the middle of the street, and he told the officers that he had "shot some bad coke." *Id*. at 443. Gutierrez became violent when placed in an EMS unit headed for a hospital, and the officers ultimately placed him in a four-point restraint with his "legs backward at a 90-degree angle in an 'L' shape" and drove him to the hospital in the patrol car while he was face down in the back seat. *Id*. Ten minutes into the drive, Gutierrez stopped struggling, and by the time they arrived at the hospital, Gutierrez had no pulse and was pronounced dead. *Id*. This court reversed summary judgment in favor of the officers with a "very limited" holding that "hog-tying may present a substantial risk of death or serious bodily harm only in a limited set of circumstances." *Id*. at 451. In doing so, the court emphasized the dangers of "hog-tying a drug-affected person in 'cocaine psychosis'" and distinguished other circuits that held the use of four-point and similar restraints to be objectively reasonable. *Id*. at 444, 450–51.

Eleven years after *Gutierrez*, this court affirmed summary judgment that a four-point restraint was not objectively unreasonable force. *See Hill*, 587 F.3d at 237. In *Hill*, the police responded to a fight between two women. *Id*. at 232. One of the women, Debbie Loggins, left the brawl to tackle and "pummel[]" a police officer. *Id*. Loggins, weighing 220 pounds, continued to kick and curse after being handcuffed, hobbled, and eventually placed in a four-point restraint. *Id*. at 232–33. The officers then placed the still struggling Loggins face down in back of the patrol car for the twenty-nine mile drive to the jail. *Id*. at 233.

No. 11-30112

Arriving at the jail thirty minutes later, the police discovered that Loggins was unresponsive with no pulse, and she was soon pronounced dead. *Id.* The Fifth Circuit affirmed summary judgment because the plaintiff "failed to develop a material fact issue that the deputies' use of four-point restraints was unnecessary, excessively disproportionate to the resistance they faced, or objectively unreasonable in terms of its peril." *Id.* at 237.[3]

We hold that Khan's treatment did not violate a clearly established right. Unlike in *Hill*, Khan was not left face down in the four-point restraint for an extended period of time. Moreover, Khan remained under constant supervision, which allowed the officers to remove the handcuffs and administer first aid quickly after he stopped breathing. The fact that this court affirmed summary judgment in *Hill* makes it difficult to establish that Khan's restraint violated a clearly established right. *See Hill*, 587 F.3d at 237.

Nevertheless, the dissent contends that the "very limited" holding in *Gutierrez* renders the officers' conduct here a violation of a clearly established right. This is incorrect for at least three reasons. First, the brevity of Khan's restraint and the constant supervision similarly distinguish this case from *Gutierrez*. Indeed, *Gutierrez* explicitly based its holding on the officers' failure to monitor the decedent during the extended car ride, "facts bearing heavily against the officers [that] are not in dispute." *Gutierrez*, 139 F.3d at 449. *See id.* at 451 ("Based on the disputed facts and undisputed facts not favoring the officers, we cannot determine whether their conduct was objectively reasonable."). Second, in determining that hog-tying "may present a substantial risk of death or serious bodily harm" to certain drug-affected people, *Gutierrez* relied primarily on a study that (as this court subsequently noted) has been

---

[3] Judge Stewart concurred in the result only and "would [have held] that on the record before us, the individual sheriff's deputies did not violate 'clearly established' constitutional rights . . . in the manner in which they subdued and transported her, and they are therefore shielded by qualified immunity even if they erred in using excessive force in the first instance." *Hill*, 587 F.3d at 232 n.*.

called into question by more recent scholarship. *Hill*, 587 F.3d at 235 (stating that *Gutierrez* "does [not] extend beyond its facts as a mirror of the then-unchallenged San Diego Study" and observing "[a] more recent study by Dr. Tom Neuman casts doubt on the conclusions of the San Diego Study").[4] Third, even assuming the research in *Gutierrez* accurately depicts the dangers of four-point restraints for someone in a drug-induced psychosis, *Gutierrez* dealt with officers who knew the decedent had—as he told the officers—"shot some bad coke." *Gutierrez*, 139 F.3d at 449 ("Viewing these disputed facts in the light most favorable to Gutierrez, the summary judgment record shows that the officers knew that Gutierrez was under the influence of drugs. . . ."). The record contains no similar knowledge by the officers in the field, despite the subsequent autopsy report that found methamphetamine in his system, and there is evidence that the officers thought Khan may have been suffering from a mental illness, just as the complaint alleges. Under our precedent in *Hill* and *Gutierrez*, we cannot say that there has been a violation of clearly established law.

Although this is a tragic incident, police officers must often make split-second decisions, and qualified immunity shields them from subsequent second-guessing unless their conduct was objectively unreasonable under clearly established law. *Wagner v. Bay City, Tex.*, 227 F.3d 316, 321 (5th Cir. 2000).

---

[4] *Gutierrez* itself acknowledged that some more recent scholarship contradicted its holding—to the point that the author of the earlier studies had since conceded that hog-tying is "physiologically neutral"—but would not consider that research because it "is not part of the summary judgment record in this case." *Gutierrez*, 139 F.3d at 451. In fact, *Gutierrez* cites to Dr. Reay's studies to support the supposed dangers of hog-tying, *id.* at 448, while later observing that those same studies had been called into question and Dr. Reay himself had changed his position, *id.* at 451. *See Prince v. San Diego*, 990 F. Supp. 1230 (S.D. Cal. 1998) ("After Dr. Reay's retraction, little evidence is left that suggests that the hogtie restraint can cause asphyxia. All of the scientists who have sanctioned the concept of positional asphyxia have relied to some degree on Dr. Reay's work. The [University of California at San Diego Medical Center] study has proven Dr. Reay's work to be faulty, which impugns the scientific articles that followed it. Like a house of cards, the evidence for positional asphyxia has fallen completely.").

Consequently, the defendants are protected by qualified immunity even if their conduct constituted excessive force.[5]

AFFIRMED.

---

[5] The dissent contends that the officers' decision to remove Khan from the store at closing time created the need for force and was objectively unreasonable given Khan's fear of people outside trying to kill him. The record shows that Khan needed to leave Winn-Dixie because the store was closing and Khan was not cooperating with store security. In hindsight, one could argue that Khan would not have panicked again had he remained in the store, away from those he feared were trying to kill him. Yet the officers on the scene did not enjoy our "20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Moreover, the dissent points to no case indicating that removing Khan from the store would violate clearly established law.

EMILIO M. GARZA, Circuit Judge, dissenting:

The majority concludes that the defendants in this case are entitled to qualified immunity as a matter of law because the constitutional right at issue was not clearly established at the time of the underlying incident. For the following reasons, I respectfully dissent.

## I

This court has twice before been confronted with a death after the application of a four-point restraint, also known as a hog-tie. Now, for a third time, we address whether application of the four-point restraint constitutes a violation of the Fourth Amendment right to be free from excessive force. In order to ascertain whether the "contours of the right" were "sufficiently clear that a reasonable officer would understand that what he is doing violates that right," I revisit each of our previous cases briefly. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense[.]").

In *Gutierrez v. City of San Antonio*, the defendant police officers found Rene Gutierrez stumbling through an intersection wearing pants, but no shoes, shirt, or other clothing. 139 F.3d 441, 442 (5th Cir. 1998). The officers observed Gutierrez running around in circles in the street and falling on his side, and initially thought he was intoxicated. *Id*. at 442-43. As they approached Gutierrez, he began swinging his arms and crawling towards the officers on his hands and knees. *Id*. at 443. Gutierrez screamed that he had been shot, but the officers were unable to locate any bullet wounds on Gutierrez or anyone in possession of a weapon nearby. *Id*. When the officers asked Gutierrez if he had taken any drugs, Gutierrez replied that he had "shot some bad coke." *Id*. The officers called for medical assistance, and when the ambulance arrived Gutierrez began pushing, kicking, yelling, and generally resisting the efforts of the medical

technicians to place him in the ambulance. *Id.* The technicians refused to transport Gutierrez in this excited state, and the officers agreed to take him to the hospital in the patrol car. *Id.* The officers placed Gutierrez in the back seat, and when Gutierrez began to kick wildly the officers placed him face down in a four-point restraint. *Id.* By the time the officers and Gutierrez arrived at the hospital, Gutierrez's heart had stopped.

Gutierrez's family sued on behalf of Gutierrez's estate, alleging various constitutional violations, including the use of excessive force in violation of the Fourth Amendment. *Id.* at 444. The district court denied the defendants' motion for summary judgment, and this court dismissed the defendants' interlocutory appeal, agreeing with the district court that Gutierrez had raised a genuine issue of material fact with respect to whether the defendants' application of a four-point restraint constituted excessive force. *Id.* at 452. In reaching this conclusion, we relied primarily on a San Diego Police Department study, introduced into the summary judgment record by Gutierrez, which found that Sudden Custody Death Syndrome (SCDS) was caused by the combination of (1) drug use, (2) positional asphyxia, (3) cocaine psychosis, and (4) hog-tying or carotid choke holds. We concluded that Gutierrez had raised issues of material fact with respect to each of the four factors, and had therefore presented "sufficient evidence that hog-tying may create a substantial risk of death or serious bodily injury in these circumstances and thereby becomes deadly force." *Id.* at 446-49.

In *Hill v. Carroll County, Mississippi*, we were faced with a second four-point restraint death. 587 F.3d 230 (5th Cir. 2009). One of the defendant-officers in *Hill* was responding to a call about a fight between two women when he arrived to find Debbie Loggins holding another woman in a headlock. *Id.* at 232. When Loggins refused to release the woman, the officer attempted to handcuff her. *Id.* Loggins, who weighed 220 pounds, released the woman and

began to attack the officer. *Id.* After a struggle, the officer handcuffed Loggins's wrists behind her back and placed her in leg restraints. *Id.* A second officer arrived, and the two officers placed Loggins in a four-point restraint, linking her handcuffs and leg restraints with an additional set of handcuffs. *Id.* at 232-33. The two officers then lifted Loggins into the back seat of a patrol car, drove to meet another officer, and placed her face down in a different car. *Id.* A third officer then transported Loggins twenty-nine miles to jail. *Id.* at 233. Upon arrival, Loggins was unresponsive and without a pulse. *Id.*

Alice Loggins Hill, Loggins's administratrix, sued on behalf of Loggins's estate, seeking damages from all three officers for violation of her Fourth Amendment rights. *Id.* Specifically, Hill challenged the first two officers' decision to place Loggins in a four-point restraint and the third officer's failure to monitor her during transport. *Id.* The district court granted motions for summary judgment in favor of the defendants. *Id.* On appeal, this court affirmed, concluding that Hill had failed to raise a genuine issue of material fact concerning the existence of a constitutional violation. *Id.* at 238. Critically, the *Hill* court distinguished *Gutierrez* on the grounds that Loggins had not shown any of "the additional contributing or associated factors that cast doubt on the propriety of the restraints." *Id.* at 236. The court noted that Hill's medical expert, Dr. Spitz, "admitted that Loggins did not exhibit evidence of drug abuse or cocaine-induced psychosis, two critical factors in the San Diego Study." *Id.* Although Dr. Spitz testified that the four-point restraint is inherently dangerous when applied to a morbidly obese woman like Loggins, the court noted that he "could not cite a single journal or report supporting this position." *Id.*

The district court in this case concluded that the facts surrounding Khan's death fell somewhere in between *Gutierrez* and *Hill*, but that *Hill* ultimately controlled. The majority has taken a different route to the same conclusion, opining that *Gutierrez* was a narrow holding that cannot be extended to the facts

of this case, and that our decision in *Hill* makes it difficult to say that the law was clearly established. The majority's reasoning is flawed in several important respects.

First, this case is distinguishable from *Hill* on its most important fact: Nayeem Khan was in a state of drug-induced psychosis when the restraint was applied. Both Khan and Gutierrez had partially disrobed, were engaging in very erratic behavior, were kicking and screaming, and were suffering from apparent delusions. The decedent in *Hill* exhibited none of these characteristics. By lumping all three cases together and comparing the actions of the officers, the majority ignores the critical distinction between *Gutierrez* and *Hill* and takes a view of the law that is too broad. *See Anderson*, 483 U.S. at 639 (noting that whether a rule is clearly established "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified").

Second, the majority overstates the degree to which the *Gutierrez* court relied on the officers' failure to monitor Gutierrez. After concluding its lengthy analysis of the four factors contained in the San Diego Study, the court listed several "facts bearing heavily against the officers," one of which was the officers' failure to monitor. The majority does not discuss the rest of that list, however: (1) "[n]either officer dispute[d] that common and inexpensive alternatives to hog-tying . . . were then available", (2) "[n]either officer disputes that hog-tying has been largely abandoned by police forces in most large cities across the nation", and (3) "unlike a rapidly evolving encounter with a potentially armed suspect in which the officer must react quickly, the officers had time to contact a supervisor to get advice on how to transport Gutierrez." *See Gutierrez*, 139 F.3d at 450 (internal citations omitted). All of these facts also "bear[ ] heavily against the officers" in this case. *Id.* at 449.

Third, the majority incorrectly relies on Dr. Neuman's study, which "casts doubt on the conclusions of the San Diego Study." *See Hill*, 587 F.3d at 235. The

*Gutierrez* court stated that Dr. Neuman's study was not in the record before the court at that time, and it is not in the record before the court now. Accordingly, it has no bearing on the holding in *Gutierrez* or on our analysis of whether *Gutierrez* applies to the facts of this case. In questioning whether *"Gutierrez* accurately depicts the dangers of four-point restraints for someone in a drug-induced psychosis," the majority inverts the qualified immunity analysis and uses it as a vehicle for revisiting, *rather than faithfully applying*, *Gutierrez.*

Fourth, the majority errs in contending that the lack of direct evidence that the officers knew Khan was under the influence of drugs distinguishes *Gutierrez*. In addition to Gutierrez's statement to the officers that he had "shot some bad coke," the *Gutierrez* court also relied on the fact that Gutierrez's "eyes were glassy, his speech was slurred, and he walked unsteadily, all classic symptoms of drug use on which the officers received police academy training." *Gutierrez*, 139 F.3d 441. The officers in this case, faced with Khan's erratic and delusional behavior, had similar reasons to suspect Khan's drug use. Moreover, as Khan's expert, Dr. Gould, testified, officers faced with an apparently delusional individual are not equipped to ascertain whether the psychotic episode is induced by cocaine (as in Gutierrez's case), methamphetamine (as in Khan's case), another hallucinogenic drug, mental illness, or something else entirely.

Fifth, to the extent that the majority distinguishes *Gutierrez* on the basis that Khan was under the influence of methamphetamine, not cocaine, this is also error. Qualified immunity does not require that the law in this specific area remain unsettled until this court has heard a case for every type of hallucinogenic drug which might produce behavior like Gutierrez's and Khan's.

In conclusion, although the *Gutierrez* holding was "very limited," it applies squarely to the facts of this case. Like Gutierrez, Khan was a "drug-affected person in a state of excited delirium" who was allegedly "hog-tied and placed face

down in a prone position." *See Gutierrez*, 139 F.3d at 451 ("[O]ur holding today is very limited.  Both the San Diego Study and Criminal Law Update article suggest hog-tying may present a substantial risk of death or serious bodily harm only in a limited set of circumstances—*i.e.*, when a drug-affected person in a state of excited delirium is hog-tied and placed face down in a prone position."). Our decision in *Hill* did not unsettle the rule established by *Gutierrez*, and the law in this area was clearly established.

## II

Because I conclude that the law was clearly established, I now address whether the plaintiffs in this case have raised a genuine issue of material fact concerning the second prong of the qualified immunity analysis.  The second prong asks whether the officers' actions were objectively reasonable "in light of clearly established law and the information the [ ] officers possessed." *Creighton*, 483 U.S. at 640.  "Qualified immunity thus protects an official whose conduct was objectively reasonable, even if the conduct infringed upon a constitutional right of the plaintiff." *Gutierrez*, 139 F.3d at 445.

As in *Gutierrez*, the plaintiffs have raised fact issues with respect to whether Khan had taken drugs, whether he died from positional asphyxia, and whether the police placed him in a hog-tie.  The plaintiffs have also presented expert testimony that the risk of a four-point restraint was exacerbated in Khan's case.  Dr. Larry Gould testified about SCDS as follows:

> As reported in Key Note # 429, published by the [International Association of Chiefs of Police], the symptoms [of excited delirium] may include rapid onset of paranoia followed by aggression towards objects and may also include psychosis, violent behavior, and extraordinary strength; hallucinations; undressing in public; . . . thrashing after restraint; . . . yelling; and self-inflicting injuries. Certain types of drugs and/or alcohol consumption may exacerbate an incident of excited delirium.  It is noted in almost all publications related to positional asphyxia that certain types of constrictions of the body such as hogtieing, being placed face down, having a knee

placed in the back, and being placed in a prone position could exacerbate the problem. . . . [T]he distinction between the sane person who acts in a deranged manner, the mentally ill person who acts psychotically, and the person who appears to be mentally ill due to the influence of drugs/alcohol is in many ways a moot point. Diagnoses should be left to the professional, while the immediate issue for the officer(s) is one of determining the intent and capabilities of the individual and taking those steps necessary to best insure the safety of the officer, the individual and others.

The district court offered the inexplicable conclusion that "nothing in [Dr. Gould's report] supports the inference that hog-tying Nayeem constituted deadly force in this case." The majority does not acknowledge Dr. Gould's testimony at all, despite its emphasis on Dr. Reay's testimony in *Gutierrez*, which is not in the current record. In both instances, judges have assumed the role of the juror. *See Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004). ("[W]hether a particular use of force is 'deadly force' is a question of fact, not one of law.").

The plaintiffs also raise an important issue of whether the officers' decision to remove Khan from the store itself created the need for the four-point restraint. Although the majority purports not to reach the second prong of the qualified immunity analysis, it addresses this issue in its final footnote, reasoning that the decision to remove Khan from the store was not unreasonable because the store was closing and Khan was not cooperating with store security. I do not agree that these two facts alone can render the officers' decision objectively reasonable as a matter of law.

The record shows that Khan was screaming that people outside were trying to kill him, that he had calmed down to a degree once he was restrained inside the store, and that he began to resist again once the officers took him outside. Khan's resistance was in accord with his apparent delusion. In his mind, the officers were taking him back into harm's way. It goes without saying that Khan had to leave the store eventually, but on the facts as the plaintiffs

have alleged them a reasonable jury could conclude that, given the apparent nature of Khan's delusion, the officers should have waited inside for medical personnel to arrive and possibly avoided the need to use the four-point restraint in the first place. Accordingly, I conclude that the plaintiffs raised genuine issues of material fact with respect to the second prong of the qualified immunity analysis.

**III**

In addition to my disagreement with the majority's conclusions, I respectfully recommend that this court consider prohibiting the application of the four-point restraint to individuals who are in an apparent state of diminished mental capacity. This rule would not be novel. *See Cruz v. City of Laramie, Wyo.*, 239 F.3d 1183, 1188 (10th Cir. 2001) ("We do not reach the question of whether all hog-tie restraints constitute a constitutional violation *per se*, but hold that officers may not apply this technique when an individual's diminished capacity is apparent."). The majority suggests that a four-point restraint in these circumstances is permissible if its application is brief and under "constant supervision." This strange necessity counsels another look at our law—the majority sanctions the use of a restraint that, when used on a certain group of vulnerable individuals, carries such a risk of death that it can only be applied legally if someone maintains constant vigilance and removes the restraint at the first sign of distress.

Of course, I am mindful of the need to balance the individual's right to be free from excessive force against the tremendous demands placed on police officers in the field. It is no coincidence that two of the three four-point restraint death cases that have come before this court involved individuals who were experiencing some sort of psychotic episode. Those who have lost contact with reality can pose a grave danger to themselves, to police officers, and to the general public. But the law should also take account of the fact that these

individuals may be uniquely susceptible to harm from a four-point restraint.

Furthermore, a broad restriction on the four-point restraint may not substantially disturb current police practices. There is evidence that the hog-tie may already be dying its own slow death. *See Gutierrez*, 139 F.3d at 449 ("The Criminal Law Update article, published in the fall of 1994 by the Texas Office of the Attorney General, notes that 'Texas agencies that have banned the use of hog-tying include Dallas, San Antonio, Austin, Corsicana, and the DPS.' Although the depositions of SAPD representatives call into doubt whether the SAPD had indeed banned hog-tying, just ten days after Gutierrez's death, SAPD Captain Benavides sent officers a memo 'reminding' them that the use of a hog-tie on an arrestee was not allowed." (internal citation omitted)). Indeed, my suggested holding would place no new prohibition on the defendant-officers in this case. The Jefferson Parish Sheriff's Office had already banned the hog-tie by the time of Khan's death.

It may be time for a new restriction on the four-point restraint. Regardless, Nayeem Khan's family brought claims that, under this court's clearly established precedent, should have survived summary judgment. I respectfully dissent.