EMILIO M. GARZA, Circuit Judge,
dissenting:
The majority concludes that the defendants in this case are entitled to qualified immunity as a matter of law because the constitutional right at issue was not clearly established at the time of the underlying incident. For the following reasons, I respectfully dissent.
I
This court has twice before been confronted with a death after the application of a four-point restraint, also known as a hog-tie. Now, for a third time, we address whether application of the four-point restraint constitutes a violation of the Fourth Amendment right to be free from excessive force. In order to ascertain whether the “contours of the right” were “sufficiently clear that a reasonable officer would understand that what he is doing *197 violates that right,” I revisit each of our previous cases briefly. See Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (“[T]he right the official is alleged to have violated must have been ‘clearly established’ in a more particularized, and hence more relevant, sense[.]”).
In Gutierrez v. City of San Antonio, the defendant police officers found Rene Gutierrez stumbling through an intersection wearing pants, but no shoes, shirt, or other clothing. 139 F.3d 441, 442 (5th Cir.1998). The officers observed Gutierrez running around in circles in the street and falling on his side, and initially thought he was intoxicated. Id. at 442-43. As they approached Gutierrez, he began swinging his arms and crawling towards the officers on his hands and knees. Id. at 443. Gutierrez screamed that he had been shot, but the officers were unable to locate any bullet wounds on Gutierrez or anyone in possession of a weapon nearby. Id. When the officers asked Gutierrez if he had taken any drugs, Gutierrez replied that he had “shot some bad coke.” Id. The officers called for medical assistance, and when the ambulance arrived Gutierrez began pushing, kicking, yelling, and generally resisting the efforts of the medical technicians to place him in the ambulance. Id. The technicians refused to transport Gutierrez in this excited state, and the officers agreed to take him to the hospital in the patrol car. Id. The officers placed Gutierrez in the back seat, and when Gutierrez began to kick wildly the officers placed him face down in a four-point restraint. Id. By the time the officers and Gutierrez arrived at the hospital, Gutierrez’s heart had stopped.
Gutierrez’s family sued on behalf of Gutierrez’s estate, alleging various constitutional violations, including the use of excessive force in violation of the Fourth Amendment. Id. at 444. The district court denied the defendants’ motion for summary judgment, and this court dismissed the defendants’ interlocutory appeal, agreeing with the district court that Gutierrez had raised a genuine issue of material fact with respect to whether the defendants’ application of a four-point restraint constituted excessive force. Id. at 452. In reaching this conclusion, we relied primarily on a San Diego Police Department study, introduced into the summary judgment record by Gutierrez, which found that Sudden Custody Death Syndrome (SCDS) was caused by the combination of (1) drug use, (2) positional asphyxia, (3) cocaine psychosis, and (4) hog-tying or carotid choke holds. We concluded that Gutierrez had raised issues of material fact with respect to each of the four factors, and had therefore presented “sufficient evidence that hog-tying may create a substantial risk of death or serious bodily injury in these circumstances and thereby becomes deadly force.” Id. at 446-49.
In Hill v. Carroll County, Mississippi, we were faced with a second four-point restraint death. 587 F.3d 230 (5th Cir. 2009). One of the defendant-officers in Hill was responding to a call about a fight between two women when he arrived to find Debbie Loggins holding another woman in a headlock. Id. at 232. When Log-gins refused to release the woman, the officer attempted to handcuff her. Id. Loggins, who weighed 220 pounds, released the woman and began to attack the officer. Id. After a struggle, the officer handcuffed Loggins’s wrists behind her back and placed her in leg restraints. Id. A second officer arrived, and the two officers placed Loggins in a four-point restraint, linking her handcuffs and leg restraints with an additional set of handcuffs. Id. at 232-33. The two officers then lifted Loggins into the back seat of a patrol car, drove to meet another officer, and placed *198 her face down in a different car. Id. A third officer then transported Loggins twenty-nine miles to jail. Id. at 233. Upon arrival, Loggins was unresponsive and without a pulse. Id.
Alice Loggins Hill, Loggins’s administratrix, sued on behalf of Loggins’s estate, seeking damages from all three officers for violation of her Fourth Amendment rights. Id. Specifically, Hill challenged the first two officers’ decision to place Loggins in a four-point restraint and the third officer’s failure to monitor her during transport. Id. The district court granted motions for summary judgment in favor of the defendants. Id. On appeal, this court affirmed, concluding that Hill had failed to raise a genuine issue of material fact concerning the existence of a constitutional violation. Id. at 238. Critically, the Hill court distinguished Gutierrez on the grounds that Loggins had not shown any of “the additional contributing or associated factors that cast doubt on the propriety of the restraints.” Id. at 236. The court noted that Hill’s medical expert, Dr. Spitz, “admitted that Loggins did not exhibit evidence of drug abuse or cocaine-induced psychosis, two critical factors in the San Diego Study.” Id. Although Dr. Spitz testified that the four-point restraint is inherently dangerous when applied to a morbidly obese woman like Loggins, the court noted that he “could not cite a single journal or report supporting this position.” Id.
The district court in this case concluded that the facts surrounding Khan’s death fell somewhere in between Gutierrez and Hill,' but that Hill ultimately controlled. The majority has taken a different route to the same conclusion, opining that Gutierrez was a narrow holding that cannot be extended to the facts of this case, and that our decision in Hill makes it difficult to say that the law was clearly established. The majority’s reasoning is flawed in several important respects.
First, this case is distinguishable from Hill on its most important fact: Nayeem Khan was in a state of drug-induced psychosis when the restraint was applied. Both Khan and Gutierrez had partially disrobed, were engaging in very erratic behavior, were kicking and screaming, and were suffering from apparent delusions. The decedent in Hill exhibited none of these characteristics. By lumping all three cases together and comparing the actions of the officers, the majority ignores the critical distinction between Gutierrez and Hill and takes a view of the law that is too broad. See Anderson, 483 U.S. at 639, 107 S.Ct. 3034 (noting that whether a rule is clearly established “depends substantially upon the level of generality at which the relevant ‘legal rule’ is to be identified”).
Second, the majority overstates the degree to which the Gutierrez court relied on the officers’ failure to monitor Gutierrez. After concluding its lengthy analysis of the four factors contained in the San Diego Study, the court listed several “facts bearing heavily against the officers,” one of which was the officers’ failure to monitor. The majority does not discuss the rest of that list, however: (1) “[njeither officer dispute[d] that common and inexpensive alternatives to hog-tying ... were then available”, (2) “[njeither officer disputes that hog-tying has been largely abandoned by police forces in most large cities across the nation”, and (3) “unlike a rapidly evolving encounter with a potentially armed suspect in which the officer must react quickly, the officers had time to contact a supervisor to get advice on how to transport Gutierrez.” See Gutierrez, 139 F.3d at 450 (internal citations omitted). All of these facts also “bear[ ] heavily against the officers” in this case. Id. at 449.
*199 Third, the majority incorrectly relies on Dr. Neuman’s study, which “casts doubt on the conclusions of the San Diego Study.” See Hill, 587 F.3d at 235. The Gutierrez court stated that Dr. Neuman’s study was not in the record before the court at that time, and it is not in the record before the court now. Accordingly, it has no bearing on the holding in Gutierrez or on our analysis of whether Gutierrez applies to the facts of this case. In questioning whether “Gutierrez accurately depicts the dangers of four-point restraints for someone in a drug-induced psychosis,” the majority inverts the qualified immunity analysis and uses it as a vehicle for revisiting, rather than faithfully applying, Gutierrez.
Fourth, the majority errs in contending that the lack of direct evidence that the officers knew Khan was under the influence of drugs distinguishes Gutierrez. In addition to Gutierrez’s statement to the officers that he had “shot some bad coke,” the Gutierrez court also relied on the fact that Gutierrez’s “eyes were glassy, his speech was slurred, and he walked unsteadily, all classic symptoms of drug use on which the officers received police academy training.” Gutierrez, 139 F.3d 441. The officers in this case, faced with Khan’s erratic and delusional behavior, had similar reasons to suspect Khan’s drug use. Moreover, as Khan’s expert, Dr. Gould, testified, officers faced with an apparently delusional individual are not equipped to ascertain whether the psychotic episode is induced by cocaine (as in Gutierrez’s case), methamphetamine (as in Khan’s case), another hallucinogenic drug, mental illness, or something else entirely.
Fifth, to the extent that the majority distinguishes Gutierrez on the basis that Khan was under the influence of methamphetamine, not cocaine, this is also error. Qualified immunity does not require that the law in this specific area remain unsettled until this court has heard a case for every type of hallucinogenic drug which might produce behavior like Gutierrez’s and Khan’s.
In conclusion, although the Gutierrez holding was “very limited,” it applies squarely to the facts of this case. Like Gutierrez, Khan was a “drug-affected person in a state of excited delirium” who was allegedly “hog-tied and placed face down in a prone position.” See Gutierrez, 139 F.3d at 451 (“[0]ur holding today is very limited. Both the San Diego Study and Criminal Law Update article suggest hogtying may present a substantial risk of death or serious bodily harm only in a limited set of circumstances — i.e., when a drug-affected person in a state of excited delirium is hog-tied and placed face down in a prone position.”). Our decision in Hill did not unsettle the rule established by Gutierrez, and the law in this area was clearly established.
II
Because I conclude that the law was clearly established, I now address whether the plaintiffs in this case have raised a genuine issue of material fact concerning the second prong of the qualified immunity analysis. The second prong asks whether the officers’ actions were objectively reasonable “in light of clearly established law and the information the [] officers possessed.” Creighton, 483 U.S. at 640, 107 S.Ct. 3034. “Qualified immunity thus protects an official whose conduct was objectively reasonable, even if the conduct infringed upon a constitutional right of the plaintiff.” Gutierrez, 139 F.3d at 445.
As in Gutierrez, the plaintiffs have raised fact issues with respect to whether Khan had taken drugs, whether he died from positional asphyxia, and whether the police placed him in a hog-tie. The plaintiffs have also presented expert testimony *200 that the risk of a four-point restraint was exacerbated in Khan’s case. Dr. Larry Gould testified about SODS as follows:
As reported in Key Note #429, published by the [International Association of Chiefs of Police], the symptoms [of excited delirium] may include rapid onset of paranoia followed by aggression towards objects and may also include psychosis, violent behavior, and extraordinary strength; hallucinations; undressing in public; ... thrashing after restraint; ... yelling; and self-inflicting injuries. Certain types of drugs and/or alcohol consumption may exacerbate an incident of excited delirium. It is noted in almost all publications related to positional asphyxia that certain types of constrictions of the body such as hogtieing, being placed face down, having a knee placed in the back, and being placed in a prone position could exacerbate the problem .... [T]he distinction between the sane person who acts in a deranged manner, the mentally ill person who acts psychotically, and the person who appears to be mentally ill due to the influence of drugs/alcohol is in many ways a moot point. Diagnoses should be left to the professional, while the immediate issue for the officer(s) is one of determining the intent and capabilities of the individual and taking those steps necessary to best insure the safety of the officer, the individual and others.
The district court offered the inexplicable conclusion that “nothing in [Dr. Gould’s report] supports the inference that hogtying Nayeem constituted deadly force in this case.” The majority does not acknowledge Dr. Gould’s testimony at all, despite its emphasis on Dr. Reay’s testimony in Gutierrez, which is not in the current record. In both instances, judges have assumed the role of the juror. See Flores v. City of Palacios, 381 F.3d 391, 399 (5th Cir.2004). (“[Wjhether a particular use of force is ‘deadly force’ is a question of fact, not one of law.”).
The plaintiffs also raise an important issue of whether the officers’ decision to remove Khan from the store itself created the need for the four-point restraint. Although the majority purports not to reach the second prong of the qualified immunity analysis, it addresses this issue in its final footnote, reasoning that the decision to remove Khan from the store was not unreasonable because the store was closing and Khan was not cooperating with store security. I do not agree that these two facts alone can render the officers’ decision objectively reasonable as a matter of law.
The record shows that Khan was screaming that people outside were trying to kill him, that he had calmed down to a degree once he was restrained inside the store, and that he began to resist again once the officers took him outside. Khan’s resistance was in accord with his apparent delusion. In his mind, the officers were taking him back into harm’s way. It goes without saying that Khan had to leave the store eventually, but on the facts as the plaintiffs have alleged them a reasonable jury could conclude that, given the apparent nature of Khan’s delusion, the officers should have waited inside for medical personnel to arrive and possibly avoided the need to use the four-point restraint in the first place. Accordingly, I conclude that the plaintiffs raised genuine issues of material fact with respect to the second prong of the qualified immunity analysis.
Ill
In addition to my disagreement with the majority’s conclusions, I respectfully recommend that this court consider prohibiting the application of the four-point restraint to individuals who are in an ap *201 parent state of diminished mental capacity. This rule would not be novel. See Cruz v. City of Laramie, Wyo., 239 F.3d 1183, 1188 (10th Cir.2001) (“We do not reach the question of whether all hog-tie restraints constitute a constitutional violation per se, but hold that officers may not apply this technique when an individual’s diminished capacity is apparent.”). The majority suggests that a four-point restraint in these circumstances is permissible if its application is brief and under “constant supervision.” This strange necessity counsels another look at our law— the majority sanctions the use of a restraint that, when used on a certain group of vulnerable individuals, carries such a risk of death that it can only be applied legally if someone maintains constant vigilance and removes the restraint at the first sign of distress.
Of course, I am mindful of the need to balance the individual’s right to be free from excessive force against the tremendous demands placed on police officers in the field. It is no coincidence that two of the three four-point restraint death cases that have come before this court involved individuals who were experiencing some sort of psychotic episode. Those who have lost contact with reality can pose a grave danger to themselves, to police officers, and to the general public. But the law should also take account of the fact that these individuals may be uniquely susceptible to harm from a four-point restraint.
Furthermore, a broad restriction on the four-point restraint may not substantially disturb current police practices. There is evidence that the hog-tie may already be dying its own slow death. See Gutierrez, 139 F.3d at 449 (“The Criminal Law Update article, published in the fall of 1994 by the Texas Office of the Attorney General, notes that ‘Texas agencies that have banned the use of hog-tying include Dallas, San Antonio, Austin, Corsicana, and the DPS.’ Although the depositions of SAPD representatives call into doubt whether the SAPD had indeed banned hog-tying, just ten days after Gutierrez’s death, SAPD Captain Benavides sent officers a memo ‘reminding’ them that the use of a hog-tie on an arrestee was not allowed.” (internal citation omitted)). Indeed, my suggested holding would place no new prohibition on the defendant-officers in this case. The Jefferson Parish Sheriffs Office had already banned the hog-tie by the time of Khan’s death.
It may be time for a new restriction on the four-point restraint. Regardless, Nayeem Khan’s family brought claims that, under this court’s clearly established precedent, should have survived summary judgment. I respectfully dissent.